H. CHARLES GAUDIN, Judge Pro Tern.
This 27th Judicial District Court litigation was instituted by Jerry Cormier, seeking benefits from Lone Star Life Insurance Company in accord with terms of a hospitalization policy issued by Lone Star. Following a bench trial, Mr. Cormier was awarded $6,230.72, which included $1,365.36 due under terms of the policy, an equal amount as a penalty and $3,500.00 as attorney fees.
The trial judge further decided that the policy was still in full force and effect as Lone Star had not cancelled by complying with LSA-R.S. 22:213(B)(7) or Section 6, page 17 of the policy.
On appeal, Lone Star contends that the trial judge erred (1) in finding that a custom had been established by the insurance company of accepting late payments, (2) in finding that Mr. and Mrs. Cormier could reasonably believe that Lone Star would not cancel if premiums were paid late, (3) in finding that if a custom had been established for late paying, the Cormiers did not receive notice of an intent to abandon the practice, and (4) in finding that the policy remained in full force and effect.
We affirm, being of the opinion that the record fully supports these factual determinations.
In his “Reasons for Judgment,” the trial judge found “... that the defendant ... is estopped from asserting the forfeiture of the policy for the late payment of premiums.”
In Carter v. Benevolent Life Insurance Company, Inc., 300 So.2d 623 (La.App. 3rd Cir.1974), and other cases, these general rules were established: First, there must be a habit or custom of accepting late premiums; and, secondly, the person insured must reasonably believe that because of this habit or custom, the insurance company will keep the policy in effect without timely premium payments.
*432 The only witness at trial in the instant case was Mrs. Cormier, who testified that she paid the Lone Star premiums and handled the insurance business because of her husband’s illness. This suit was caused by Lone Star’s refusal to pay benefits for Mr. Cormier’s back surgery in June of 1983. The insurance company argues that the policy was cancelled effective April 30, 1983.
Mrs. Cormier said that payments were usually mailed late. In evidence, and marked “P-2” and “D-l,” is a Lone Star document showing the dates of the Cormier payments. Prom June, 1982 to the attempted cancellation in May, 1983, not a single premium was paid on the due date and only five were paid within the 31-day grace period.
Nonetheless, Lone Star relies on several letters to prove that a custom of accepting late payments without objection was not established and that, furthermore, the Cor-miers could not have believed that the policy would be maintained without prompt payment of premiums. On November 9, 1982, Lone Star wrote to the Cormiers saying:
“This letter is a reminder to you about the telephone conversion on November 9, 1982. The premiums on your Group Insurance Policy have not been received. The policy requires that coverage be provided and premiums to be paid for the grace period.
“We hope that it is your intention to continue this valuable coverage and the premiums were unpaid in error. If you fail to send us the amount by 11/19/82 your policy will be terminated effective you paid through date.
“It is our hope that you will give us the opportunity to continue this valuable coverage for your employees. Should you have any questions regarding this matter, please do no hesitate to contact us.”
Two months later, on January 7, 1983, Lone Star reminded them that a premium was overdue and giving the insureds 20 days to pay. No doubt Lone Star was not happy with the late payments but the insurance company accepted them.
On May 3, 1983, Lone Star sent this letter:
“The premium which became due April 1, 1983 in the amount of $176.21 on your group insurance policy numbered above has not been received. For this reason, the policy has terminated. The policy requires that coverage be provided and premiums be paid for the grace period. “We hope that it is your intention to continue this valuable coverage and the premiums were unpaid in error. We will be happy to reinstate the policy if premium for past due and current month premiums totaling $352.42 are received within 10 days from the date of this letter.
“If your policy is not reinstated and your employees were contributing toward the cost of their benefits, it is possible that you may be held solely liable for any benefits due for contributions collected after the date of termination.
“It is our hope that you will give us the opportunity to continue this valuable coverage for your employees. Should you have any questions, please do not hesitate to contact us.”
The very next day, on May 4th, the insurance company wrote again to the Cormiers, saying:
“Our records reflect that your premium payments in the past have not been received in our office within the grace period provided in the policy.
“The policy provides that the premium is due on the first day of the month, however, you are given an additional thirty-one days as a grace period. In the event the premiums are not received within this period the policy shall terminate at the end of such period and you are still liable for the grace period premium.
“In order to protect your valuable insurance coverage and to guard against untimely termination it is very important for future premium payments to be made on a timely basis.
“We look forward to continuing to serve your insurance needs. Should you have *433 any questions, please do not hesitate to contact us.”
Lone Star continued to receive and cash late payment checks, including checks dated May 4th (the April premium) and May 16th (the May premium.) On May 20,1983, Lone Star wrote and advised that the policy had been cancelled effective April 30, 1983; and on May 27, 1983, this letter was sent:
“We regret to inform you that your recent application for reinstatement of group hospitalization insurance coverage has been declined. Therefore, the insurance will remain terminated effective 4-30-83. .
“Any payment that may have been received after the termaination date are enclosed. We are sorry that we are unable to be of further service to you.” Lone Star’s May 27th letter brought the
following response (dated June 7th) from the Cromiers’ attorney, Charles F. Boagni III:
“This letter is directed to you in reference to the above captioned subject matter and the cancellation of certain hospili-zation insurance coverage. Attached hereto for your ready reference, I enclose a letter dated May 27, 1983.
“Please be advised that I have reviewed the payments made by said client, to your company and prior to your letter her payments had been forwarded to your company and one check was subsequently cashed after May 20, 1983. Enclosed herewith for your ready reference kindly find the last four check cashed by your company in reference to this account.
“According to my client records, she is not in arrears with your company and all premiums have been paid through May. Enclosed herewith is the check due your company for the month of June.
“In the event you feel that this policy is still cancelled, your writer would now make demand on you to forward to this office a complete readout of payment received within the last twelve months.
“Your prompt attention in this subject matter will be appreciated.
“It is also noted that on the letter dated May 27, 1983, there were no payments returned to said client. Your company is still in receipt of all of the monies hereinabove referred to.”
As Mr. Boagni’s letter states, a check for $176.21 dated June 5, 1983, signed by Mrs. Cormier, was enclosed. This was the June premium and was the last payment made by the Cormiers to Lone Star. Mr. Cormier was operated on in June, and Lone Star refused to pay the medical bills.
Mrs. Cormier said that she has actually been paying premiums late since 1974. Lone Star’s coverage, through the National Grocery Trust, dated back two or two and a half years, Mrs. Cormier stated.
Considering Mrs. Cormier’s testimony along with the documentary evidence, the trial judge found that Lone Star “... had not effected a cancellation of the policy for late payment.” Mrs. Cormier said that because she had always been tardy, she did not believe that Lone Star would terminate coverage.
Lone Star, citing Hebert v. Woodruffs Insurance Company, 19 So.2d 290 (La.App. 1st Cir.1944), and relying primarily on the November 9, 1982 and January 7, 1983 letters, argues that if a habit had been established for accepting late payments, that the insurance company could and did give notice that the custom would be discontinued. These letters, however, do not give such notice. Instead, they encouraged the Cormiers to keep their “valuable coverage” in force; if any real notice was meant to be conveyed, other wording in the letters watered down the threat to terminate, certainly in Mrs. Cormier’s appreciation.
We cannot say either that the trial judge’s factual findings were manifestly wrong or that the record does not substantiate his determinations. Thus, we cannot reverse. See Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), and numerous subsequent cases with similar holdings.
The policy in question was in force from January 1, 1983 to January 1, 1984. The trial judge declared that Lone Star had not *434 cancelled by effectively complying with either R.S. 22:213(B)(7) or the policy itself. The statute requires the refund of the unearned portion of any premiums paid, and this was not immediately done. In fact, Lone Star negotiated the check for the May premium simultaneously with its attempt to cancel as of the end of April, 1983.
The termination provisions of the policy are in Section 6, page 17. It says that coverage ceases at the end of the grace period (31 days) if the premium is not paid.” As stated in Carter v. Benevolent Life Insurance Company, Inc., supra, and as found by the trial judge here, however, there was a custom of accepting late premiums and the insured could reasonably believe that because of this custom, the policy would remain viable despite tardy payments.
In the Cormiers’ answer to Lone Star’s appeal, they request an increase of $2,500.00 in attorney fees for handling the appeal if oral arguments were waived, as they were. We find the amount awarded by the trial judge sufficient to cover both the trial and this appeal; therefore, the request for an increase is denied.
We affirm the district court judgment of November 14, 1984, with appellant to pay all costs.
AFFIRMED.