723 So.2d 531 (1998)
Joseph LEDENT, Jr., et al., Plaintiffs-Appellants,
v.
GUARANTY NATIONAL INSURANCE CO., et al., Defendants-Appellees.
No. 31,346-CA.
Court of Appeal of Louisiana, Second Circuit.
December 28, 1998.
*532 O'Neal & Norris By Hodge O'Neal, III, Charles Shelby Norris, Jr., Monroe, Counsel for Appellants Joseph Ledent, Jr. Nelson Ray Moore Flora Nell Gulley.
Aubert & Pajares By James P. Meyer, Metairie, Counsel for Appellant Betty Moore.
Voorhies & Labbe' By Cyd Sheree Page, Lafayette, Counsel for Appellee Guaranty National Ins. Co.
Davenport, Files & Kelly By William G. Kelly, Jr., Monroe, Counsel for Appellees Sidney Stokes National Casualty Co.
Bordelon, Hamlin & Theriot By William J. Hamlin, New Orleans, Counsel for Appellee International Paper Co. William C. Ellison David E. Walker.
Provosty, Sadler & deLaunay By John D. Ryland, Alexandria, Counsel for Appellee American Interstate Ins. Co.
Hudson, Potts & Bernstein By Brian P. Bowes, Monroe, Counsel for Appellee Isaac Fields, Acceptance Ins. Co.
Richard L. Fewell, Jr., Monroe, Counsel for Appellee James O. Pearson, J.O.P. Enterprises, Inc.
*533 Before BROWN, STEWART and GASKINS, JJ.
GASKINS, J.
This appeal involves the granting of three summary judgments in a tort action arising from an accident involving a log truck and a car. Two occupants of the car were killed and three others were injured when the load from the log truck crushed their vehicle. Summary judgments were granted in favor of Guaranty National Insurance Company, the log truck driver's auto liability insurer; International Paper Company, the timber company to which the logs were being delivered; and Sidney Stokes, the person under whose wood purchase contract the delivery was being made, and National Casualty Company, Stokes' insurer. The plaintiffs appeal. For the reasons set forth below, we affirm the summary judgments in favor of Guaranty National Insurance Company and International Paper Company. The summary judgment in favor of Stokes and National Casualty Company is also affirmed.

FACTS
The accident occurred on December 13, 1995, in Morehouse Parish. James Pearson was driving north on Highway 139 with a load of timber destined for the International Paper (IP) mill in Bastrop. An automobile carrying three women and two children was proceeding in the opposite direction. The car occupants were Betty Moore, Flora Nell Gulley, her minor child Laqueshia Gulley, Alisa Ledent, and her minor child Tiffany Moore. The load on the log truck apparently shifted and caused the truck to cross into the other lane of traffic. The logs then fell off of the truck, crushing the car. Mrs. Ledent and her daughter were killed; the other occupants were injured.
Suit was brought by Mrs. Moore and her husband; Ms. Gulley individually and on behalf of her minor daughter; and Joseph Ledent, Jr., Mrs. Ledent's widower and the father of Tiffany. (Mrs. Moore has separate legal representation whereas the other plaintiffs share the same counsel.) Named as defendants were IP; Pearson and his insurer, Guaranty National Insurance Company; JOP Enterprises, Inc., Pearson's company; Isaac Fields, who cut and loaded the timber on Pearson's truck[1]; Fields' insurer, Acceptance Insurance Company; Sidney Stokes, who had a wood purchase contract with IP and who subcontracted to Fields the job of delivering the wood to IP's mill; and Stokes' insurer, National Casualty Company.
Several of the defendants filed motions for summary judgment. The trial court granted summary judgment in favor of Guaranty, IP, and Stokes and his insurer. The plaintiffs appeal from the judgments dismissing these parties from the suit.

SUMMARY JUDGMENT LAW
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991); Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.7/5/94), 639 So.2d 730.
Summary judgments are governed by La.C.C.P. art. 966, which was amended in both the 1996 and 1997 legislative sessions. See Acts 1996, 1st Ex.Sess., No. 9, and Acts 1997, No. 483. The effect of these amendments is to establish that summary judgment is now favored. Indeed, the summary judgment procedure is today designed to secure the just, speedy, and inexpensive determination of every action allowed by law. La. C.C.P. art. 966(A)(2); NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 (La.App.2d Cir. 8/21/96), 679 So.2d 477. Since the amended versions of the article are procedural in nature, they are subject to retroactive application. Curtis v. Curtis, 28,698 (La.App.2d Cir.9/25/96), 680 So.2d 1327; Short v. Giffin, 96-0361 (La.App. 4th Cir.8/21/96), 682 So.2d 249, writ denied, 96-3063 (La.3/7/97), 689 So.2d 1372.
A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories and admissions on *534 file, together with affidavits, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). The burden of proof remains with the mover. La. C.C.P. art. 966(C)(2). When a motion is made and supported as required under art. 966, however, an adverse party may not rest on the mere allegations or denials of his pleadings, but his response must set forth specific facts showing a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. La. C.C.P. art. 967.

GUARANTY'S SUMMARY JUDGMENT
In its motion for summary judgment, Guaranty National Insurance Company contends that its vehicle liability policy with its insured, Pearson, expired six days before the accident. It asserts that the coverage period for Pearson's policy was December 7, 1994 to December 7, 1995, and that it had expressed willingness to renew the policy in November 1995. However, the policy was not renewed by Pearson, and Guaranty's representative informed Pearson that his coverage had lapsed during a telephone conversation on December 8, 1995. As the premiums had not been paid, Guaranty maintained that it had no insurance policy covering Pearson at the time of the accident.
Pearson obtained his vehicle liability insurance with Guaranty through the Harold Jarvis Insurance Agency (Jarvis) in Arkansas, where his truck was registered. According to Pearson, Jarvis had customarily accepted late payments throughout the term of his policy and had always continued his coverage without lapse. Consequently, after the accident, on December 28, 1995, he sent Jarvis a late premium payment of one-half the amount due to secure coverage on the vehicle he was driving at the time of the accident. However, Jarvis refused to accept the payment.
A hearing on Guaranty's motion for summary judgment was held in October 1997. In December 1997, the trial court issued a written ruling in which it granted summary judgment in favor of Guaranty and dismissed it from the suit. It found that the original policy issued by Guaranty was not in effect and had not been timely renewed.
The plaintiffs appealed the granting of summary judgment in favor of Guaranty. They argue that Guaranty was estopped under either Louisiana or Arkansas law from denying coverage due to its practice of accepting late payments. They argue that Guaranty failed to give statutory notice of nonrenewal under either La. R.S. 22:636.4(D) or A.C.A. § 23-89-305(b)(1). However, Guaranty argues that since it expressed a willingness to renew, it was not required to give the statutorily mandated notice of nonrenewal.

Evidence
Guaranty supported its motion for summary judgment with excerpts from the depositions of Pearson and Charles Harris, an agent for the Jarvis Agency, as well as correspondence between these men and the insurance policy itself. In opposition to the motion, copies of several Arkansas cases and the complete depositions of Pearson and Harris were filed. Our review of this evidence reveals the following history concerning Pearson's policy with Guaranty.
Harris was the sub-agent on the Pearson file and, as such, the direct contact person with Pearson. However, Harbor Excess and Surplus was the agent dealing directly with Guaranty. A policy covering Pearson's vehicles and trailers was issued for the period of December 7,1994 to December 7,1995. This policy was the only business transacted between Pearson and Jarvis. The initial payment was made to Jarvis. Pearson entered into a premium finance agreement with Universal Premium Acceptance Corporation (UPAC), a separate entity from Harbor; he made premium payments directly to UPAC. In the event of a late payment, both Jarvis and Pearson would receive notice.
During the term of the policy, Pearson increased his liability limits; on this one occasion, Jarvisnot Guaranty"fronted" him the down payment for the premium increase. On June 26,1995, Harris wrote Pearson after Jarvis received notice that his check to UPAC had been returned unpaid. At this time, he reminded Pearson that he owed *535 Jarvis $301 for the premium increase but urged him to pay UPAC first. Harris offered to work with him to secure payment on his account. On August 4, 1995, Harris wrote Pearson about his failure to pay his balance despite his repeated promises to do so. Harris informed him that Jarvis was not in the credit business and, if he did not pay, Jarvis would request that Harbor cancel his policy for nonpayment. Pearson settled his account with Jarvis.
In February 1995, also during the term of the policy, Pearson removed a driver named Gary Huff from the policy. Thus, at the time of the policy expiration in December 1995, Huff was no longer a covered driver under the policy.
As the end of the policy term approached, Harris received an expiration notice from Harbor, which contained the information necessary for renewal. By letter dated November 8, 1995, Harris communicated to Pearson Harbor's willingness to renew and its terms therefor. He also informed Pearson that the total renewal premium for his policy was $5,966; if he desired to finance again with UPAC, the 30% down payment would be $1,825.[2] He also told Pearson that a renewal application had to be filled out and signed by Pearson and, in order to continue coverage, the application and down payment had to be returned to Harbor before December 7,1995.
Pearson failed to respond to this letter.[3] On December 8, 1995, Harris telephoned Pearson to inform him that his policy had expired and that he no longer had coverage. During this conversation, Pearson told Harris that his trucks had been "sitting up" for about a month and that he was looking elsewhere for a cheaper quote.[4] Pearson admitted that during the conversation Harris specifically told him that he had no coverage; he further admitted that Harris never offered to front him any money. Nor did Harris offer to renew his policy; to the contrary, Harris told him that he lacked authority to cover him and that it was up to the insurance company to decide. Pearson also conceded that Harris told him that he needed to go and fill out an application; by his own admission, Pearson never fulfilled this requirement.
Pearson sent a letter dated December 28, 1995 to Jarvis seeking a continuation of his insurance from December 7, 1995 to December 7, 1996 for his 1986 Freightliner and his 1978 Kent log trailer, the vehicle and trailer involved in the accident at issue in this case. He deleted coverage for his 1978 Road Boss and 1950 Hobbs log trailer. With the letter he sent a check for $912.50, one-half of the amount quoted by Harris in the November 8, 1995 letter which Pearson could not specifically recall receiving. In his deposition, Pearson stated that he sent the letter thinking that "maybe" he might still have coverage in force based on his prior late payments.
Upon receipt of Pearson's letter, Harris contacted Harbor, which was aware of the accident on December 13. Harbor told him that it would accept a new application for a new policy. Harris responded by letter dated January 2, 1996, informing Pearson that he would have to complete a new application to be reconsidered for coverage. However, that coverage would not be effective until the application was received and approved by Harbor. Harris also returned Pearson's check.

Law
Although Pearson's truck was registered in Arkansas, it remained primarily in Louisiana. Thus, a question arises as to whether to apply Arkansas or Louisiana law. However, we conclude that there is no insurance coverage by Guaranty under the law of either state.
*536 Under Arkansas law, notice of nonrenewal is governed by A.C.A. § 23-89-305, which provides in pertinent part:
(a) No insurer shall fail to renew a policy unless it shall mail or deliver to the named insured at the address shown in the policy, at least twenty (20) days' notice of its intention not to renew and, unless it shall also mail or deliver to its agent serving the policy, at least thirty (30) days in advance of nonrenewal, a statement of the grounds for nonrenewal.
(b)(1) This section shall not apply:
(A) If the insurer has manifested its willingness to renew; or
(B) In case of nonpayment of premium.
Given Guaranty's willingness to renewas manifested in Novemberit is readily apparent that this section does not apply to the facts at hand. See Farmers Insurance Company v. Hall, 263 Ark. 734, 567 S.W.2d 296 (1978).
In a similar vein, La. R.S. 22:636.4 provides, in relevant part:
D. (1) An insurer may decide not to renew a policy if it delivers or mails to the first-named insured at the address shown on the policy written notice it will not renew the policy. Such notice of nonrenewal shall be mailed or delivered at least sixty days before the expiration date. If the notice is mailed less than sixty days before expiration, coverage shall remain in effect under the same terms and conditions until sixty days after notice is mailed or delivered. Earned premium for any period of coverage that extends beyond the expiration date shall be considered pro rata based upon the previous year's rate. For purposes of this Section, the transfer of a policyholder between companies within the same insurance group shall not be a refusal to renew. In addition, changes in the deductible, changes in rate, changes in the amount of insurance, or reductions in policy limits or coverage shall not be refusals to renew.
(2) Notice of nonrenewal shall not be required if the insurer or a company within the same insurance group has offered to issue a renewal policy, or where the named insured has obtained replacement coverage or has agreed in writing to obtain replacement coverage.
Once again, given Guaranty's initial offer to renew the policy, the statutory notice of nonrenewal was not mandated in this instance.
Plaintiffs also assert that the insurer's offer was not one to truly renew the same policy because the renewal policy would have excluded one of Pearson's drivers. However, the record demonstrates that Pearson had the driver, Huff, removed during the term of the policy. Consequently, at the time of the offer to renew, this driver was already excluded from coverage.
The jurisprudence of Arkansas has established that if an insurer has repeatedly accepted overdue payments, it waives its right to insist, without notice, upon a strict compliance with the due date set in the insurance contract. See American Republic Life Insurance Company v. Claybough, 227 Ark. 946, 302 S.W.2d 545 (1957); Union Life Insurance Co. v. Brewer, 228 Ark. 600, 309 S.W.2d 740 (1958); Jones v. American Pioneer Life Insurance Company, 255 Ark. 474, 500 S.W.2d 748 (1973).
Likewise, Louisiana jurisprudence has applied the doctrine of equitable estoppel to situations where an insurer's custom of accepting overdue premiums reasonably led the insured to believe that his policy would remain in effect even though the premiums were not paid when due. In such a case, the following criteria apply: (1) there must be a habit or custom of accepting overdue premiums; and (2) the insured must reasonably believe that by reason of this custom the insurer will maintain the policy in effect without prompt payment of the premiums. Lafargue v. United Royal Life Insurance Company of Louisiana, 169 So.2d 240 (La.App. 4th Cir.1964); Carter v. Benevolent Life Insurance Company, 300 So.2d 623 (La.App. 3d Cir.1974), writ denied, 304 So.2d 666 (La. 1974); Bodi v. Government Employees Insurance Company, 349 So.2d 1327 (La.App. 1st Cir.1977), writ denied, 350 So.2d 1215 (La.1977); State Farm Mutual Automobile Insurance Company v. Maryland Casualty *537 Company, 490 So.2d 819 (La.App. 3d Cir. 1986), writ denied, 494 So.2d 1182 (La.1986); and Cormier v. Lone Star Life Insurance Company, 500 So.2d 431 (La.App. 3d Cir. 1986).
Under the jurisprudence of either state, Pearson is not entitled to coverage. The record does not demonstrate that the insurer repeatedly accepted late payments. On one occasion, Jarvis "fronted" money when Pearson increased his liability limits. Furthermore, given the specific facts of the instant case, Pearson cannot be said to have had a reasonable belief that his coverage would be continued. By Pearson's admission, the day after the policy expired by its own terms, Harris informed him that he had no coverage and that Harris could not guarantee him that the insurer would continue to cover him. Pearson further admitted that Harris instructed him that he would have to submit a new application to the insurer for its consideration and that he never complied with those directions.
We find that summary judgment in favor of Guaranty National Insurance Company was proper.

IP'S SUMMARY JUDGMENT
In its motion for summary judgment, IP sought dismissal from the suit on the basis that it dealt with Stokes, an independent contractor, and could not be held vicariously liable for the negligence of persons over whom it exercised no control. In support of its motion, IP submitted into evidence its contract with Stokes, as well as depositions from Stokes, Pearson, Fields, and IP's logging division manager, Gary Farley.
The trial court granted IP's motion for summary judgment, finding that IP was involved in an independent contractor-principal relationship with Stokes and that IP lacked control over the "step-by-step operation" of the independent contractor's work.
The plaintiffs appeal from the dismissal of IP by summary judgment.[5] They contend that there were unresolved matters of material fact involving issues of control which should have gone to a jury. They assert that a jury could have concluded that Pearson was an agent for IP and that IP thus had vicarious liability for his actions. They also argue that a jury could have found IP personally liable for negligent hiring of irresponsible independent contractors or for not barring Pearson from delivering wood to it without a current valid insurance certificate.
IP asserts that most of the plaintiffs' arguments are speculative and not based upon the evidence submitted on the motion for summary judgment. IP maintains that the undisputed facts show that it exercised no control over Stokes' execution of their wood purchase contract, IP was not independently negligent in any respect, and that even Stokes was unaware that Pearson was hauling timber under his contract with IP.

Independent contractor
A principal generally is not liable for the offenses committed by an independent contractor while performing its contractual duties. Morales v. Davis Brothers Construction Company, Inc., 94-0902 (La.App. 4th Cir.12/15/94), 647 So.2d 1302, writ denied, 95-0139 (La.3/17/95), 651 So.2d 271; Thomas v. Albertsons, Inc., 28,950 (La. App.2d Cir.12/11/96), 685 So.2d 1134, writ denied, 97-0391 (La.3/27/97), 692 So.2d 395. Two exceptions to this general rule exist: (1) where the work is ultra hazardous; and (2) if the principal reserves the right to supervise or control the work of the independent contractor. Morales, supra; Thomas, supra. The work is ultra hazardous when, as a matter of law, it can cause injury to others, even when conducted with the greatest prudence and care. Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982).
An independent contractor relationship exists when:
1. There is a valid contract between the parties;
2. The work being done is of an independent nature such that the contractor may employ nonexclusive means in accomplishing it;
3. The contract calls for specific piecework as a unit to be done according to the *538 independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;
4. There is a specific price for the overall undertaking; and
5. Specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.
Smith v. Zellerbach, 486 So.2d 798 (La. App. 1st Cir.1986), writ denied, 489 So.2d 246 (La.1986); Morales, supra.
The most important inquiry is whether the principal retained the right to control the work. In applying this test, it is not the supervision and control which is actually exercised which is significant; the important question is whether, from the nature of the relationship, the right to do so exists. Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385 (1972); Smith, supra; Morales, supra; Perkins v. Gregory Mfg. Co., 95-01396 (La.App. 3d Cir.3/20/96), 671 So.2d 1036, writ denied, 96-0971 (La.5/31/96), 673 So.2d 1039.

Joint venture
The essential elements of a joint venture are generally the same as those of a partnership, namely, two or more parties combining their property, labor, skill, etc. in the conduct of a venture for joint profit, with each having some right of control. Peterson v. BE & K Incorporated of Alabama, 94-0005 (La.App. 1st Cir.3/3/95), 652 So.2d 617, writs denied, 95-0818 & 95-0831 (La.5/12/95), 654 So.2d 350.
The requisites of a joint venture were set forth in Cajun Electric Power Cooperative, Inc. v. McNamara, 452 So.2d 212 (La.App. 1st Cir.1984), writ denied, 458 So.2d 123 (La.1984). They are:
1. A contract between two or more persons;
2. A juridical entity or person is established;
3. Contributions by all parties of either efforts or resources;
4. The contributions must be in determinate proportions;
5. There must be joint effort;
6. There must be a mutual risk vis-a-vis losses;
7. There must be a sharing of profits.

Discussion
We have examined the wood purchase contract between IP and Stokes, as well as the deposition testimony submitted in connection with IP's motion for summary judgment. The evidence demonstrates that Stokes had been delivering wood to IP for many years. Their relationship was governed by the terms of a wood purchase contract entered into annually by Stokes and IP's Ouachita Logging & Fiber Supply division. This contract specified the amounts and types of wood acceptable to IP and the price per unit which IP would pay for wood delivered to and found to be acceptable at the IP mill in Bastrop. The contract required that the contractor carry vehicular insurance, proof of which was to be provided to IP.
The contract also contained the following provision:
10. Independent Contractor Status: No relationship of employer-employee or master and servant is intended, nor shall be construed, to exist between SELLER and PURCHASER, or between PURCHASER and any servant, agent, employee and/or supplier of SELLER. SELLER shall select and pay its own servants, agents, employees and/or suppliers and neither SELLER nor its servants, agents, employees or suppliers shall be subject to any orders, supervision or control of PURCHASER.
Like the trial court, we readily find that IP was involved in an independent contractor-principal relationship with Stokes and that IP lacked control over the "step-by-step operation" of Stokes' work. There was a valid contract between IP and Stokes which established a fairly typical principal/independent contractor relationship. By its terms, Stokes was free to employ nonexclusive means in accomplishing the delivery of the *539 wood. The contract called for unit work to be done according to Stoke's own methods; it was not subject to any control or direction by IP, which was interested only in obtaining the specified amounts and types of wood. Furthermore, the contract set a specific price for the work and established a specific time or duration for the contract.
In order to keep IP in the present lawsuit, the plaintiffs raise a variety of other potential grounds for liability. However, we find nothing in the record tending to support these assertions. The evidence submitted on summary judgment does not indicate that the parties were engaged in a joint venture as defined by our jurisprudence. Nor does it suggest any independent negligence on IP's part. Furthermore, we find nothing in the contract which contravenes public policy.
The summary judgment in favor of IP was properly granted and is accordingly affirmed.

STOKES' SUMMARY JUDGMENT
Stokes and his insurer also moved for summary judgment on an independent contractor theory. They contended that Pearson was an independent contractor who worked for Fields, whoin turnwas an independent contractor occasionally working for Stokes. Thus, any relationship between Stokes and Pearson was twice removed. Furthermore, Stokes asserted that he exercised no control over the manner in which Fields operated his business, including the hiring of drivers. (Stokes and his insurer supported their motion for summary judgment with the same evidence and depositions with which IP supported its motion.[6])
The trial court granted summary judgment in favor of Stokes and his insurer. The court found that no relationship existed between Stokes and Pearson whereby the former could be held vicariously liable for the latter's negligence.
The plaintiffs appeal. They raise many of the same arguments pertaining to independent contractors mentioned in connection with IP's summary judgment.

Evidence
As the sole proprietor of Sidney Stokes Timber, Stokes owned logging equipment, including log trucks and a trailer. He carried six employees on his payroll, deducting taxes and social security from their wages and generating W-2 forms for them at the end of the year. These employees harvested and delivered wood to various mills, including the IP mill at Bastrop.
In addition to these employees, Stokes also had several independent haulers such as Isaac Fields who occasionally delivered wood to the Bastrop mill under Stokes' IP contract number. Upon delivering the wood, the hauler would be given a ticket documenting the load; a contract number was necessary to generate the ticket. IP paid Stokes for the wood as specified under their contract; Stokes paid the independent contractor, who then paid his own employees. Fields, like the other independent contractors who hauled for Stokes, had approached Stokes about delivering under the auspices of Stokes' contract.
Stokes testified that he personally inspected the log trucks and trailers of the persons hauling under his contract. Once a month, he tried to visually check the general appearance of the vehicles.
At the time of the accident, Fields had been delivering wood to IP under Stokes' contract for about two years. However, he did not haul exclusively for Stokes. Both Stokes and Fields testified that Stokes did not keep up with where or when Fields worked. In fact, Stokes would be unaware of a delivery until afterwards when he received a ticket.
In the course of operating his own logging business, Fields hired and paid his own employees. Fields would make a deal with a landowner to cut timber and then harvest it; Stokes played no role in securing the wood cut by Fields. Fields owned and used his own equipment to harvest wood. However, of all of the contractors who hauled for *540 Stokes, Fields was the only one who did not own trucks in which to haul the timber he harvested; consequently, he hired drivers with trucks of their own like Pearson.
Fields hired Pearson to haul wood for him on the day of the accident. Pearson had already hauled one load to IP and was en route to deliver a second load when the accident occurred. Prior to engaging his services, Fields did not require Pearson to produce a certificate of insurance. Nor did he inspect Pearson's truck or check his driving record.
Pearson had hauled directly for Stokes on a few occasions in 1994 and early 1995. However, due to a lapse in Pearson's insurance, Stokes instructed him not to haul under his contract any more. In the event that Stokes might need his services in the future, Pearson sent him a certificate of insurance for his policy period ending December 7, 1995. However, Stokes did not engage his services again. Stokes testified that he was unaware that Pearson was hauling for Fields. Had he known, Stokes testified he would have objected or at least checked the dates on the insurance certificate in his possession.

Independent contractor
The primary question in determining whether Stokes is entitled to an independent contractor defense is whether he had the right to control and supervise the work performed by Pearson. Based upon the evidence submitted in connection with this motion for summary judgment, we find that he retained no such control.
Stokes' relationship with Fields was that of principal/independent contractor. Stokes exercised no direct control over Fields' day-to-day operation. Fields autonomously decided when and where to work. He also determined who worked for him without any input from Stokes.
Although Stokes testified that he tried to periodically inspect vehicles used by those who hauled under his contract, this obviously applied to those haulers who owned their own trucks. Fields did not own any logging trucks which Stokes could routinely inspect; instead, Fields hired various drivers as needed to haul timber. Additionally, the mere fact that Stokes testified that he would have voiced an objection to Fields' use of Pearson is not determinative. The record does not show that he had any authority to terminate Pearson's relationship with Fields.
In turn, the evidence demonstrates that Pearson was an independent contractor working for Fields. He supplied his own equipment for hauling the wood. As the driver, he determined what was placed on his truck and how. He also bound the load.
The evidence submitted in connection with this summary judgment shows no grounds for imposing vicarious liability upon Stokes for the torts of Pearson. Likewise, the record contains no evidence tending to support the alternative bases for liability asserted by the plaintiffs. There is nothing to indicate that Stokes was involved in a joint venture. Furthermore, we see no evidence of independent negligence on Stokes' part.
We find that summary judgment in favor of Stokes was appropriate.

Insurance coverage
In her separate brief, Mrs. Moore asserts that the trial court failed to rule on the question of whether the insurance policy issued by National Casualty to Stokes provided coverage for nonowned vehicles such as Pearson's. She contends that Pearson was operating a nonowned auto in the furtherance of the business of Stokes, the insured under the policy, and that the policy thus provided coverage for the instant accident.
Under the terms of his policy with National Casualty, Stokes had liability coverage of $500,000 per accident on nonowned autos. The policy defines a nonowned vehicle as follows:
NONOWNED "AUTOS" ONLY. Only those "autos" you [Named Insured shown on the Declaration] do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your employees or partners or members of their households but only while used in your business or your personal affairs.
Mrs. Moore argues that under the jurisprudence, Pearson's vehicle qualified as a nonowned auto and that the National Casualty *541 policy thus provides coverage. See Gore v. State Farm Mutual Insurance Co., 26,417 (La.App.2d Cir.1/25/95), 649 So.2d 162, writ denied, 95-0481 (La.4/21/95), 653 So.2d 555, writ not considered, 95-0503 (La.4/21/95), 653 So.2d 555; Dean v. State Farm Mutual Automobile Insurance Company, 518 So.2d 1115 (La.App. 4th Cir.1987), writ denied, 522 So.2d 1096 (La.1988).
The exact terms of the complete policy are not before us.[7] We have no basis for assumingand Mrs. Moore does not contendthat Pearson is an insured under the policy. Any coverage afforded under the policy for the liability of its insured, Stokes, is contingent upon Stokes having liabilitybe it personal or vicarious. As we have already found that the record is devoid of evidence of liability on the part of Stokes, the policy does not provide coverage of Pearson's vehicle.
Based upon the law and the evidence filed in the record, summary judgment in favor of Stokes and National Casualty is appropriate. Accordingly, we affirm the trial court's granting of summary judgment dismissing them from the present suit.

CONCLUSION
The summary judgment in favor of Guaranty National Insurance Company is affirmed. The summary judgment in favor of International Paper Company is affirmed. The summary judgment in favor of Sidney Stokes and National Casualty Company is also affirmed.
Costs are assessed against the plaintiffs.
AFFIRMED.
NOTES
[1] According to the plaintiffs' brief, Fields and his insurer recently settled with the plaintiffs.
[2] This amount provided coverage on two vehicles and two trailers.
[3] In his deposition, Pearson was unable to recall receiving the letter. He stated that it might have been delivered to his house, but he never saw it and no one brought it to his attention. However, it was mailed to his residence, the same place where he had received all of his other correspondence from Harris and the address stated in the policy. Harris testified that Pearson indicated during their telephone conversation on December 8, 1995, that he had received it.
[4] In fact, Pearson contacted All Risk of Monroe between December 8 and December 28, received a cheaper quote, and later purchased insurance through that agency.
[5] Mrs. Moore adopted the other plaintiffs' brief on this matter.
[6] Although Mrs. Moore's counsel suggests that summary judgment was premature because Pearsonwho faces criminal charges arising from this fatal accidentinvoked his Fifth Amendment rights when asked about his relationship with Stokes, the record contains ample evidence pertaining to the business relations among the parties.
[7] In opposition to Stokes and National Casualty's motion for summary judgment, a copy of the National Casualty policy was filed into the record. However, that copyas it appears in the appellate recordis incomplete. A motion to correct and supplement the record by Stokes and National Casualty was denied by this court as we could not determine whether the omissions were made in the compilation of the appellate record or in the original filing to the trial court, in which case this court would be bound on appeal to consider only that which was before the trial court. In its denial of the motion to supplement, this court noted the availability of a motion to the trial court to determine the source of the omissions. By letter to the clerk of this court, counsel for Stokes and National Casualty advised that review at the trial court level had revealed that the copy submitted to the trial court in opposition to the motion for summary judgment was incomplete. Consequently, counsel stated that no further motion to correct the record would be pursued.