756 So.2d 1279 (2000)
Malcolm MADDOX, as Natural Tutor of the Minors, Laura Maddox and Kelly Maddox, Plaintiff,
v.
Denise G. KEEN, James M. Keen, and Allstate Insurance Company, Defendants.
No. 33,072-CA.
Court of Appeal of Louisiana, Second Circuit.
April 7, 2000.
*1281 Hudson, Potts & Bernstein, L.L.P. by Mark J. Neal, Monroe, Counsel for appellant, Allstate Insurance Company.
Dollar, Laird & Scott by Johnny E. Dollar, Monroe, Counsel for appellee, Malcolm Maddox.
Arbour & Aycock by G. Larry Arbour, West Monroe, Counsel for appellee, Denise G. Keen.
Walter C. Dunn, Jr. and Stacy Auzenne, Alexandria, Counsel for appellee, James M. Keen.
Before BROWN, CARAWAY and DREW, JJ.
CARAWAY, J.
In this automobile accident litigation, the defendants' automobile insurer claims that the policy terminated seven days before the accident because of the insured's failure to pay an installment on the premium and a renewal premium. The plaintiff and defendants assert that coverage exists on grounds of equitable estoppel and waiver by the insurer. All parties sought summary judgment on the coverage issue. Following the trial court's granting of partial summary judgment in favor of plaintiff and defendants finding coverage under the policy, the insurer appeals. Finding that the policy terminated at the end of its term and that estoppel and waiver did not occur, we reverse the trial court and grant the insurer's motion for summary judgment.

Facts and Procedural History
This action arises from an automobile collision in which a truck being driven by Denise Keen ("Denise") struck a vehicle occupied by Malcolm Maddox's two minor children. Although the truck Denise was driving was owned by her husband, James Keen ("James"), James and Denise were legally separated at the time. Maddox sued Denise for negligence, brought action against James under a theory of negligent entrustment and sued Allstate Insurance Company (Allstate Insurance Company and its subsidiary, Allstate Indemnity Company hereinafter collectively referred to as "Allstate") as the alleged insurer of the truck. James then brought a third party demand against Denise claiming she was the true party at fault in the accident and against Allstate alleging it had breached its duty to defend him.
James purchased a six-month Allstate vehicle insurance policy, effective July 7, 1997 through January 7, 1998. When James failed to pay his premium for November 1997, Allstate sent a cancellation and renewal notice, dated December 18, 1997, informing James that the policy would be canceled on January 7, 1998 unless timely payment of $2372.22 was made. The notice also informed James that a portion of the $2372.22 represented payment for the renewal of the policy. In a letter to James dated December 31, 1997, James' Allstate insurance agent, Bobby Johnson, expressed his concern that James had failed to make his premium payments and that his policy was about to be canceled. James failed to make a payment prior to January 7. On January 14, 1998, Denise was involved in the automobile accident while driving James' 1997 Dodge pickup truck.
In a letter to James dated January 15, 1998, Allstate referenced the collision and *1282 reserved all of its rights under the terms of the policy. Prior to and at the time of the wreck, James was working offshore. When James returned to the state on January 17, 1998, he received the cancellation notice, correspondence from Johnson and letter from Allstate. On January 19, 1998, James traveled to Monroe and brought a check for $2372.22 to Johnson, post-dated January 23, 1998, for payment of his past due premium and payment on a renewal policy. Allstate sent James a letter dated January 20, 1998 disclaiming liability for the accident alleging the policy was not in force on the date of the collision. When Allstate posted James' check to its system on January 31, 1998, it reinstated the policy with a lapse in coverage from January 7 until January 31, the period the policy was not in effect, and it credited the policy $714.30 in the form of an unearned premium for the period James was not insured by Allstate.
Allstate initially filed a motion for summary judgment alleging James' policy had lapsed or was terminated for non-payment of premiums on the date of the accident. Pursuant to written reasons, the court denied the motion. Afterwards, Maddox, James, and Denise filed additional motions for summary judgment which the court granted recognizing the existence of insurance coverage for the January 14, 1998 accident. James also filed a motion for summary judgment seeking penalties and attorney fees from Allstate on the grounds that it had failed to provide him a defense. This motion was denied.
The trial court certified its judgment in favor of Maddox, James and Denise finding insurance coverage, and Allstate appealed. James answered the appeal seeking a reversal of the trial court's denial of his motion for summary judgment regarding Allstate's duty to defend.

Discussion
The parties' arguments over the disputed January 7 termination of the policy involve the issues of equitable estoppel and waiver. The doctrine of equitable estoppel requires review of Allstate's actions for billing and receiving of payments prior to January 7, while the issue of waiver concerns its actions after that date.
Before considering these issues, however, we will review the Louisiana Insurance Code provision concerning the cancellation and renewal of automobile liability policies, La. R.S. 22:863.1, and the recent case of Adamson v. State Farm Mutual Automobile Insurance Co., 95-2450 (La.App. 1st Cir.6/28/96), 676 So.2d 227. The Adamson case dealt with a similar dispute over nonpayment of a premium at the conclusion of the term of a policy and the issue of renewal of the policy. The court noted the distinction between cancellation of the policy for some cause or breach and termination of the policy by the running of its term. "[W]hen a policy expires from the running of its term, it is not being disrupted, but is instead dying a natural death." Id. at 232. Nevertheless, La. R.S. 22:636.1(E)(1) statutorily provides for the renewal rights of the insured, as follows:
"E.(1) No insurer shall fail to renew a policy unless it shall mail or deliver to the named insured, at the address shown in the policy, at least twenty days advance notice of its intention not to renew. This Subsection shall not apply:
(a) If the insurer has manifested its willingness to renew.
(b) In case of nonpayment of premium..."
After considering the provisions of the insurance code, the Adamson court ruled:
The jurisprudence is clear that, when an insured purchases a policy, he is or should be aware of the term of that policy. He has no right to expect that that policy will continue in effect until he decides to pay another premium. [Citation omitted]

*1283 In the instant case, by its own terms, plaintiffs' insurance policy was to remain in effect until July 15, 1992. By sending a renewal notice to plaintiffs on June 11, 1992, with a due date of July 15, 1992, State Farm manifested to plaintiffs a willingness to renew their policy and continue coverage through January 15, 1993, if plaintiffs paid the renewal premium by July 15, 1992. The renewal notice sent to plaintiffs states that, if the renewal premium was not paid by the due date of July 15, 1992, the policy would expire on that date. Thus, plaintiffs were given the option of continuing or terminating coverage. At that point, State Farm was obligated to renew the policy only if plaintiffs indicated their desire to renew the coverage and made payment of the premium on or before July 15, 1992. Plaintiffs' failure to make timely payment caused the policy to lapse by its own terms on July 15, 1992.
Id. at 232-233. [Emphasis in original].
Similarly, in this case, in the absence of an estoppel, James' policy terminated by its own terms on January 7. On that date, James had breached the terms of the prior policy by his non-payment of installments and had made no payment on the renewal premium of his policy. Like the insurer in Adamson, Allstate had manifested its intent, as discussed below, to renew the policy to provide coverage after January 7 but only if timely payment by James was made.

Equitable Estoppel
In Louisiana, the doctrine of equitable estoppel applies to situations where an insurer's custom of accepting overdue premiums reasonably leads an insured to believe his policy will remain in effect even though he has not paid the premiums when due. A recent case on equitable estoppel from our court held that "[t]he following criteria apply: (1) there must be a habit or custom of acceptance of overdue premiums; and (2) the insured must reasonably believe that by reason of this custom the insurer will maintain the policy in effect without prompt payment of the premiums." Ledent v. Guaranty Nat'l Ins. Co., 31,346 (La.App.2d Cir.12/28/98), 723 So.2d 531 (cited cases omitted). The doctrine of equitable estoppel is designed to prevent a miscarriage of justice by preventing one from taking a position contrary to his prior acts, admissions, representations, or silences when another has changed his position in detrimental reliance thereon. Professional Credit Services of New Orleans, Inc. v. Skipper, 543 So.2d 498 (La.App. 4th Cir.1989). It is to be used cautiously because it bars the normal assertion of rights otherwise present. There must be reliance that is justified. Cudahy Foods Company v. Rich Plan of Baton Rouge, 349 So.2d 894 (La. App. 1st Cir.1977), writ denied, 351 So.2d 172 (1977).
During the six-month term of this policy from July 7, 1997 through January 7, 1998, a lengthy period of over 90 days went by without James paying any monthly installment for the premium. James argues that this laxity on Allstate's part in not requiring timely payment of the premium installments is the basis for the application of the doctrine of equitable estoppel.
On the other hand, Allstate showed that after James's initial payment on the premium of $922.50 in late July 1997, there was a change in the policy with an endorsement for another vehicle being added. This interrupted the billing cycle and required the balance on the premium to be recalculated. On September 20, 1997, in response to Allstate's September 17 bill for the recalculated premium, James paid $1700 by check, yet the check had to be returned for insufficient funds on October 3. In response to this failure to pay, Allstate generated a notice of cancellation mailed to James on October 18. The cancellation *1284 notice advised that the policy would be canceled on November 7, 1997 unless a payment of $2926.73 was made. James made that payment on October 31 and the policy was not canceled.
From our review of the billing and payment data for this policy, we find that Allstate first would bill James approximately twenty days before a monthly payment was to come due on the seventh of each month. Because of the endorsement to the policy and recalculation of the premium in August 1997, no bill for payment was mailed in August and no September 7 payment was required by Allstate. The initial bill with a recalculated monthly installment amount was sent to James on September 17. When payment was not made by October 7, a second billing document, a cancellation notice, was generated by Allstate approximately ten days after the missed payment date. The cancellation notice required that payment be made by November 7 to prevent cancellation of the policy.
From this billing pattern, James clearly became delinquent for the October 7 payment and coverage was allowed to be extended until November 7. Nevertheless, the notice of cancellation generated before the November 7 installment date was a last warning of Allstate's intent to cancel. James then paid the delinquent premium before the stated cancellation date of Allstate's warning.
When we compare the September/October pattern for the billing, cancellation notice and James's October 31 payment response with the November through January sequence of events, the circumstances are different. After being billed in November for the December 7 installment, James again failed to pay. On December 18, a second cancellation notice (hereinafter the "Cancellation/Renewal Notice") was mailed by Allstate listing the policy cancellation date as January 7, 1998. Since the termination of the six-month policy was also January 7, the December 18 Cancellation/Renewal Notice alerted James to the need to renew the policy and set forth the payment information for monthly premiums for the new six-month renewal term. The Cancellation/Renewal Notice set forth the minimum amount due of $2372.22, of which $1458.37 was listed as the amount of past due premiums, and further stated:
The insurance afforded under your policy will be cancelled if we do not receive the Minimum Amount Due before the Cancel Date and time of 12:01 a.m. Standard Time on January 7, 1998.
Upon receiving this Cancellation/Renewal Notice, James did not pay Allstate prior to the January 7 deadline. This was the first time during the six-month term of the policy that James was delinquent in response to an Allstate notice of cancellation. Since there was no prior custom or pattern by Allstate in accepting premiums after the deadline listed in a notice of cancellation, we do not find that James could reasonably believe that Allstate would maintain the policy after January 7 without prompt payment of the premiums before the January 7 termination date. Accordingly, we do not find that the facts demonstrate that an equitable estoppel applies in this case. The policy expired by its own terms on January 7.

Waiver
Waiver is generally understood to be the intentional relinquishment of a known right, power or privilege. Steptore v. Masco Construction Company, Inc. 93-2064 (La.8/18/94), 643 So.2d 1213. Waiver occurs when there is an existing right, a knowledge of its existence and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished. Id. A waiver may apply to any provision of an insurance *1285 contract, even though this may have the effect of bringing within coverage risks originally excluded or not covered. Id.
It is well established that an insurer is charged with the knowledge of the contents of its own policy. In addition, notice of facts which would cause a reasonable person to inquire further imposes a duty of investigation upon the insurer, and failure to investigate constitutes a waiver of all powers or privileges which a reasonable search would have uncovered. Id. As to coverage, it is the party who seeks to avoid the application of a policy's provisions who must come forward with evidence sufficient to support a waiver. Tate v. Charles Aguillard Ins. & Real Est., Inc., 508 So.2d 1371 (La.1987).
In a very similar case involving the renewal of an automobile liability policy, the court in American Surety Company of New York v. Fowler, 135 So.2d 663 (La. App. 3d Cir.1961) addressed the issue of the insurer's waiver by its receipt of money for a delinquent premium after the stated time of cancellation of the policy. Because of the insured's failure to have paid the premium, the insurer mailed a notice of cancellation on February 19 advising that the policy would be canceled as of 12:01 a.m. on March 4. After the accident occurred at 9:00 a.m. on March 4, the insured immediately reported the accident to the insurer and later that day tendered to his agent an amount to cover the balance of the delinquent premium. The agent in turn issued a receipt for the payment upon which he wrote "renewal." The receipt also stated that receipt of the payment was effective to renew the policy only as of the time and date of the payment. By subsequent letters on March 5, April 8 and April 23, the insured was repeatedly informed of the insurer's denial of coverage for the March 4th accident.
From the above facts, the court concluded that the insurer did not waive the cancellation of its policy which had become effective only hours before the accident. The court ruled:
"... Fowler does not show any detrimental reliance upon his part so as to estop State Farm from subsequently denying coverage, 45 C.J.S. Insurance § 672, p. 610 and 672, p. 612; nor does he show any waiver of the defense of policy cancellation, since `Waiver involves intent or consent, express or implied, on the part of the company,' even though (unlike estoppel) `it may arise without insurer doing anything to mislead insured to his disadvantage, prejudice or injury,' 45 C.J.S. Insurance § 673, pp. 613-614. See Wheeler v. London Guarantee & Accident Co., 180 La. 366, 156 So. 420."
An additional provision of La. R.S. 22:636.1, Section (E)(2), provides as follows:
"Renewal of a policy shall not constitute a waiver or estoppel with respect to grounds for cancellation which existed before the effective date of such renewal."
In this case, appellees assert waiver based on various actions and inactions by Allstate. Allstate's receipt of James' January 23 check and its actions in later providing defense counsel to James for these proceedings are actions which allegedly imply a waiver of Allstate's right of termination of the policy. Additionally, appellees assert that Steptore, supra, requires the insurer to obtain a non-waiver agreement executed by both the insurer and the insured in order to prevent a waiver under these circumstances where it provides a defense or accepts a delinquent payment.
The circumstances surrounding Allstate's receipt of James' January 23 check are best revealed by Allstate's written communication to James preceding the January 23 payment. First, the December *1286 18 Cancellation/Renewal Notice as quoted above clearly states that the policy would be canceled on January 7 unless a minimum payment of $2372.22 was received by Allstate for the past due premium and for the down payment for a six-month renewal of the policy. This notification was followed by a December 31 letter from James' local agent, Bobby Johnson, in which the termination date was reiterated. After the termination date and one day after the January 14 accident, an Allstate representative from Allstate's Monroe field claim office mailed James a letter concerning the claim resulting from the January 14 accident. The letter stated that with respect to that accident "you are advised that Allstate Indemnity Company reserves all rights and defenses which it has in conjunction with the policy." The letter states that any Allstate action for investigation or for "any defenses which we may undertake on your behalf ... does not constitute a waiver." Finally, the January 15 letter states:
"We are reserving our right to later disclaim any obligation under the policy and assert a defense of no coverage under the policy because verification must be made that your policy, XXXXXXXXX, was paid in full and in force and the time of the loss on 1/14/1998."
The final Allstate document which was mailed to James before January 23 is a January 20 letter from an Allstate representative which states:
"With respect to the accident in which you were involved or for which you may be legally liable, occurring on January 14, 1998, in Monroe, LA, the Allstate company name hereby disclaims and denies any and all liability or obligation to you or others under its policy numbered # XXXXXXXXX and issued to James Keen. This disclaimer is made because the aforementioned policy was not in force on the date of the accident due to a lack of payment per agreed terms on your premium."
On January 19, James tendered $2372.22 in the form of a post-dated January 23 check. James asked that the check not be presented for payment before January 23. After the check was processed by Allstate, James received notification by Allstate in the form of a document entitled "Automobile Policy Reinstatement Notice." The reinstatement notice stated:
"Your policy was canceled effective at 12:01 a.m. Standard Time on January 7, 1998. Your policy was reinstated at 12:01 a.m. Standard Time on January 31, 1998. A payment was credited to your policy in the amount of $2372.22."
Based upon the above written communication by Allstate to James concerning the termination of the policy, we do not find that Allstate's receipt of James' check amounted to an implied waiver. Before James' delivery of the check on January 19, the termination of the policy had clearly occurred on January 7 and the January 15 Allstate letter had expressly reserved Allstate's right to verify whether the policy was paid in full before being obligated for coverage for the January 14 accident. Before January 23, the date that James instructed Allstate to receive payment via his check, the January 20 letter had expressly disclaimed a coverage obligation for the January 14 accident due to the termination of the policy for non-payment. These express non-waiver documents all communicated Allstate's intent to James prior to its acceptance of the January 23 payment. With this express documentation, a contrary intent to waive Allstate's termination right may not be implied from Allstate's mere receipt of the post-dated check on January 19.
Even when we consider the deposition testimony of James and Linda Clark, the secretary of the local Allstate agent who received James' check on January 19, we find no material fact issue concerning an Allstate waiver. James admitted in his *1287 testimony that neither Clark nor anyone from Allstate told him on January 19 that there would be continuous coverage. He also stated that he asked Clark about a thirty-day grace period and she told him Allstate did not have a thirty-day grace period. Nevertheless, in presenting his check, James was "hoping for" a grace period by Allstate. Additionally, James admitted that he knew Clark did not have authority to make a binding decision on behalf of Allstate to grant a waiver.
James makes a further argument that Allstate waived its right to assert a coverage defense because of its first communication with plaintiffs' attorney after the filing of this suit. On April 1, 1998, Walter Dunn, an attorney retained by Allstate to protect the interests of James, Denise and Allstate sent a letter to Maddox's attorney requesting an extension of time to answer the suit. The letter did not indicate that Allstate would be asserting a coverage defense or disclaiming the duty to defend James and Denise. However, shortly thereafter and prior to an answer being filed on behalf of any party, Allstate recognized the potential conflict of interest between the defendants and appointed Dunn to represented James, Larry Arbour to represent Denise and Charles Herold to represent Allstate and assert its coverage defense.
From that point forward in this litigation, each of these three separate attorneys represented one of the defendants, filing pleadings and motions on their behalf and appearing at discovery depositions and in court. We therefore hold that Dunn's preliminary communication with the plaintiffs' attorney did not constitute a waiver of Allstate's right to assert a coverage defense.
Finally, we reject the technical assertion by appellees that Allstate waived the January 7 termination of the policy by its actions after that date without first obtaining a non-waiver agreement signed by James. Steptore, supra, makes no such technical requirement. As the commentary on the Steptore opinion has noted:
"The court did not discuss what constitutes a non-waiver agreement. Presumably, the court is not requiring a written instrument executed by both parties. A written communication from the insurer to the insured should be sufficient when it gives notice that the insurer, while willing to undertake the defense of the insured, reserves its rights to such coverage defenses. If the insured then accepts defense by the insurer, the insured does so with knowledge of the potential conflict of interest and with the implicit agreement that the insurer has reserved its coverage defenses."
McKenzie & Johnson, Insurance Law and Practice, Sec. 216 at 459 N15 La. Civil Law Treatise (1996).
In summary, Allstate gave express written statements of its intent not to waive the January 7 termination of the policy prior to applying James' January 23 payment to renew the policy and prior to Dunn's involvement in James' defense in these proceedings. The portion of James $2372.22 that Allstate accepted to renew the policy was applied after a lapse in the policy from January 7 through January 30. This lapse or termination of the policy was expressly communicated to James before and after the January 23 payment. Accordingly, we find that the policy terminated and that Allstate did not waive the termination right in this case. American Surety Company of New York, supra; La. R.S. 22:636.1(E)(2). The trial court's grant of appellees' motions for summary judgment is reversed. Under the procedural circumstances of this case, there being no material issue in the facts as presented by all parties, Allstate's motion for summary judgment regarding coverage for this accident under James' policy is granted. See, Magnon v. Collins, 98-2822 (La.7/7/99), 739 So.2d 191.

*1288 Duty to Defend Claim

Apart from the foregoing coverage dispute, a separate motion for summary judgment was filed by James concerning his claim against Allstate for Allstate's failure to have provided him a defense to these proceedings. The duty to defend and coverage are separate and distinct issues. Treadway v. Vaughn, 633 So.2d 626 (La.App. 1st Cir.1993).
The trial court denied James' motion for summary judgment. The judgment was an interlocutory ruling that did not determine the merits of James' claim. La. C.C. art. 1841. Such interlocutory ruling is not appealable of right, there being no possibility for irreparable injury. La. C.C.P. art.2083. Nevertheless, following Allstate's appeal of the coverage dispute, James answered the appeal seeking to have this court review the trial court's interlocutory ruling which denied his summary judgment. Such answer to the appeal of a partial final judgment is inappropriate.
Allstate appealed the trial court's grant of a partial summary judgment concerning the insurance coverage issue. That partial judgment was then certified or designated as a final judgment by the trial court pursuant to La. C.C.P. art. 1915(B). The certification for appeal of the coverage issue could not extend to the interlocutory ruling of the trial court denying James' separate motion for summary judgment, and James' claim remains for final adjudication in the trial court. Accordingly, with the issue of Allstate's duty to defend not properly before this court, we dismiss James' answer to the present appeal on jurisdictional grounds. La. C.C.P. art. 2162.

Conclusion
The trial court's ruling granting summary judgment to James, Denise and Maddox on the issue of insurance coverage is reversed and Allstate's motion for summary judgment on this issue is hereby granted. James' answer to the appeal is dismissed on jurisdictional grounds. Costs of this appeal are assessed 50% to Maddox and 50% to James and Denise.
SUMMARY JUDGMENT IN FAVOR OF MALCOLM MADDOX, JAMES KEEN AND DENISE KEEN REVERSED; SUMMARY JUDGMENT IN FAVOR OF ALLSTATE DISMISSING CLAIMS FOR INSURANCE COVERAGE OF THE JANUARY 14, 1998 ACCIDENT GRANTED.
BROWN, J., concurs in the result.