# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #031

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **27th day of June, 2025** are as follows:

**BY McCallum, J.:**

2024-C-01519    *MARILYN H. MCBRIDE, DAVY A. DOWDY, AND JOEY E. MILLER  VS. OLD REPUBLIC INSURANCE COMPANY, JOHN K. WOODARD, DAVID G. BROOKS, SR., AND ENABLE MIDSTREAM PARTNERS, LP (Parish of Red River)*

AFFIRMED IN PART; AFFIRMED AS AMENDED. SEE OPINION.

Crain, J., dissents in part and assigns reasons.
Griffin, J., dissents in part and assigns reasons.

# SUPREME COURT OF LOUISIANA

## No. 2024-C-01519

## MARILYN H. MCBRIDE, DAVY A. DOWDY, AND JOEY E. MILLER

## VS.

## OLD REPUBLIC INSURANCE COMPANY, JOHN K. WOODARD, DAVID G. BROOKS, SR., AND ENABLE MIDSTREAM PARTNERS, LP

On Writ of Certiorari to the Court of Appeal, Second Circuit, Parish of Red River

**McCALLUM, J.**

An employee who is injured during the course and scope of his employment is entitled to workers' compensation benefits under Louisiana law. Independent contractors, however, are expressly excluded from the workers' compensation laws and thus not entitled to benefits for work-related injuries. There are a few exceptions, one of which is implicated in this case. Independent contractors who are injured while performing manual labor for a substantial part of their work time are covered by the workers' compensation laws. La. R.S. 23:1021 (7), *infra*. (the "manual labor exception"). Correspondingly, a principal for whom the independent contractor performs work is immune from a tort lawsuit.

The primary issue in this case is whether an independent contractor's *employees* and its *own* independent contractors fall within the manual labor exception set forth in La. R.S. 23:1021 (7). The remaining issues concern the trial court's apportionment of fault and damages.

In construing the specific language of the workers' compensation statutes, and in particular, La. R.S. 23:1021 (7), we hold that both the independent contractors of an independent contractor and the employees of an independent contractor do not fall within the manual labor exception. As a result, an independent contractor's

employees and independent contractors are not limited to workers' compensation and may assert tort claims against a tortfeasor. To the extent workers' compensation benefits are available, the employees may pursue those claims from their direct employers.

For this reason, and as discussed more fully herein, the trial court correctly found that the claims of Joey Miller and Davy Dowdy (collectively, "plaintiffs") against Enable Midstream Partners, LP ("Enable"),[1] sound in tort rather than workers' compensation. Plaintiffs were employed by White Oak Radiator Service, Inc. ("White Oak"), the former as a direct employee and the latter as an independent contractor, to perform work pursuant to a contract between White Oak and Enable. Although Mr. Dowdy and Mr. Miller were manual laborers, they do not fall within the manual labor exception, as neither were Enable's independent contractors as contemplated by La. R.S. 23:1021 (7).

We also find no manifest error in the trial court's award of damages to Mr. Dowdy for injuries to his cervical spine and for his hearing loss. However, we find the lower courts erred in the apportionment of fault. The record demonstrates that White Oak bears a greater percentage of fault than that assigned by the trial court. We therefore reapportion fault and amend the judgment to assign 70 percent fault to Enable and 30 percent fault to White Oak. As amended, the trial court's judgment is affirmed.

**FACTS AND PROCEDURAL HISTORY**

Enable was the owner of the Magnolia natural gas processing plant located in Ringgold, Louisiana. Integral to Enable's processing of natural gas was the use of amine and glycol coolers to remove impurities from the gas. Bryan Garrett, the amine operator of the Magnolia plant, and John Woodard, Enable's Operations and

---

[1] Enable is now Energy Transfer, LP.

Maintenance leader, described the process involving the use of these coolers. Natural gas is first processed in the amine cooler, where an amine solution (an aqueous solution made up of 50% amine and 50% water) removes carbon dioxide and hydrogen sulfide. The gas, being saturated with water, is next diverted to the glycol cooler, where the water is removed. After being sent to a compressor station, the gas goes to the sales department and, finally, on to customers.

Due to an increased need for capacity, Enable retained White Oak to remove and replace its amine and glycol coolers in April 2018.[2] Their agreement was memorialized in several purchase orders which incorporated general terms and conditions by reference to a link to Enable's website. The general terms and conditions included the provision that "Seller [White Oak] is an independent contractor" and that "Seller's personnel will not be considered employees of Buyer [Enable]. . . ." The terms and conditions required White Oak to "comply with all safety and security rules and requirements of [Enable] and take all precautions required to prevent injury to persons. . . during such installments or work. . . ." Enable also had a Contractor Safety Handbook and, like the general terms and conditions, it was made available by a link to its website.

White Oak's work for Enable was rescheduled on a couple of occasions. It was finally set to begin in June 2018 and on June 4, 2018, Enable shut down the plant to prepare for the work. On the evening of June 5, 2018, Enable's night crew performed a "lockout" and "tagout" procedure.[3] This procedure, a safety measure

---

[2] White Oak was the manufacturer of the original and replacement amine and glycol coolers at the Magnolia plant.

[3] A "lockout" is "[t]he placement of a lockout device on an energy isolating device, in accordance with an established procedure, ensuring that the energy isolating device and the equipment being controlled cannot be operated until the lockout device is removed." 29 C.F.R. § 1910.147 (b). A "tagout" is "[t]he placement of a tagout device on an energy isolating device, in accordance with an established procedure, to indicate that the energy isolating device and the equipment being controlled may not be operated until the tagout device is removed." *Id*.

that ensures equipment is properly shut off, has as its purpose the isolation and elimination of potential energy sources while work takes place.[4]

Enable stopped the flow of natural gas and purged the glycol cooler by draining it.[5] According to Mr. Garrett, the pipes are drained by "block[ing] in one end, hook[ing] the air hose through a valve and push[ing] all the liquid out with compressed air, out of the system." Mr. Garrett further testified that, at that point in the shutdown, after the glycol had been removed from the cooler, certain valves were left open to "bleed any air that was trapped in the pipe." The glycol surge tank was also open to the air. Enable tested the area with a gas monitor which reflected a zero lower explosive limit ("LEL").[6]

The next morning, on June 6, 2018, White Oak personnel arrived at the Magnolia plant to perform the contracted work. This included White Oak employees Joey Miller, a helper, and Marilyn McBride, its safety coordinator, as well as independent contractors, including Davy Dowdy. Enable provided a site orientation, which included watching a video, following which Ms. McBride conducted a Job Safety Analysis ("JSA"). No JSA was conducted by Enable.

White Oak had intended to remove the glycol cooler by cutting the bolts on it and lifting it out with a crane. However, it became apparent that there was insufficient clearance for the crane to lift it due to its piping. According to Ms. McBride, this changed the scope of the job, necessitating the use of an acetylene torch to cut the piping to the cooler. Colton Nickerson, a welder who worked as an independent contractor of White Oak, also testified that White Oak could not "cold

---

[4] Mr. Garrett identified energy sources as "[p]umps, motors, fans, that sort of thing."

[5] According to Mr. Woodard, 3500 gallons of glycol was pumped from the glycol cooler.

[6] Michael Sawyer, plaintiffs' process safety expert, explained that the LEL, sometimes referred to as an "LFL, lower flammable limit" is "simply the limits, the very lowest limit that a. . . flammable or a hazardous material can combust."

cut" (*i.e.* cut without a heat source) the piping as they "couldn't get cold cutters around [the pipe] because there's two pipes running together."

With the contemplated use of an acetylene torch, the project now involved "hot work," described by Mr. Garrett as "cutting, grinding, welding, [use of] combustion engine, power tool, anything producing a spark." In order to perform "hot work," a "hot work" permit, designed to ensure an area is safe for performing hot work, is required. White Oak requested a hot work permit and Mr. Garrett issued it, understanding that "they was [sic] going to cut the pipe from the cooler."

Joey Miller, a White Oak employee who was acting as a "helper," was assigned to assist Mr. Nickerson, who was to cut the piping with the acetylene torch. Before commencing the work and while Mr. Nickerson was on his ladder (being held by Mr. Miller), Davy Dowdy arrived at the scene. Mr. Dowdy noticed a dark liquid which "had spilled out from the piping" under Mr. Nickerson's ladder. This liquid "changed the color of the rocks." Mr. Dowdy advised Mr. Nickerson that he would watch the liquid to ensure it did not "catch on fire." Mr. Nickerson then began to cut the pipe with the torch. He heard a hissing sound, but he continued to cut when, suddenly, the glycol surge tank, located about four to five feet from him, erupted; its end cap blowing off. The ladder on which Mr. Nickerson was standing was blown away, leaving him dangling from a harness.

Ms. McBride, Mr. Dowdy, and Mr. Miller filed the instant lawsuit seeking damages for injuries sustained in the June 6, 2018 incident. The matter proceeded to a bench trial, following which judgment was rendered in favor of Mr. Dowdy and Mr. Miller; no damages were awarded to Ms. McBride.[7] Mr. Dowdy was awarded general damages, as follows:

- Past medical expenses: $58,955.10

---

[7] Ms. McBride did not appeal the trial court's judgment and Mr. Miller's damages claim was not raised in the court of appeal. The only challenged damages were those awarded to Mr. Dowdy.

5

- Permanent loss of hearing, past and future pain and suffering: $100,000.00

- Cervical spine injuries, past and future pain and suffering: $100,000.00

- Lumbar spine injuries, past and future pain and suffering: $100,000.00

- Future medical and aftercare related to cervical spine: $209,000.00

- Future medical and aftercare related to lumbar spine: $130,000.00

The trial court reduced the damages awards for the lumbar and cervical spine injuries by 1/5 due to Mr. Dowdy's pre-existing conditions. The trial court assigned 90 percent fault for the incident to Enable and 10 percent fault to White Oak. It then reduced Mr. Dowdy's award by the ten percent fault assigned to White Oak.

Enable appealed the trial court's judgment, raising several issues: whether plaintiffs' exclusive remedy is under the Louisiana workers' compensation laws; whether the doctrine of superseding and intervening cause should have been applied by the trial court; the allocation of fault; and quantum (including whether the trial court erred in applying the presumption of causation set forth in *Housley v. Cerise*, 579 So. 2d 973 (La.1991)). The court of appeal reversed the damages awarded for Mr. Dowdy's lumbar spine injuries, finding that Mr. Dowdy failed to meet his burden of proving "that it was more probable than not that the rupture caused or exacerbated his lumbar condition." *McBride v. Old Republic Ins*. Co., 55,772, p. 55 (La. App. 2 Cir. 10/9/24), 399 So. 3d 859, 889. In all other respects, the court of appeal affirmed the trial court's judgment and remanded the matter to the trial court for it to reduce the special damages award for those past medical expenses attributable to Mr. Dowdy's treatment for his lumbar spine.[8]

Enable filed a writ application with this Court, which we granted. *McBride v. Old Republic Ins. Co*., 24-01519, p. 1 (La. 3/18/25), 402 So. 3d 1209.

---

[8] Only the damages awarded to Mr. Dowdy for his hearing loss and his cervical spine injuries were raised as issues by Enable in this appeal. The damages awarded to Mr. Dowdy for his lumbar spine injuries were not raised in this appeal but are the subject of a writ application filed by Mr. Dowdy currently pending before this Court.

## LAW AND DISCUSSION

This case raises both questions of law and questions of fact, each employing a different standard of review. Purely legal questions are reviewed *de novo*. *See Louisiana Mun. Ass'n v. State*, 04-0227 (La. 1/19/05), 893 So. 2d 809, 836 ("Questions of law, such as the proper interpretation of a statute, are reviewed by this court under the *de novo* standard of review."). Questions of fact, on the other hand, are subject to a manifest-error standard of review. *Westlawn Cemeteries, L.L.C. v. Louisiana Cemetery Bd*., 21-01414, p. 12 (La. 3/25/22), 339 So. 3d 548, 559.

Our first task is to review this matter *de novo* to resolve a question of law – whether plaintiffs' personal injury claims fall exclusively within the scope of the workers' compensation laws. We then address, under a manifest-error standard of review, the allocation of fault and Mr. Dowdy's damages award.

### *Remedy in tort vs. workers' compensation*

Under the Louisiana Workers Compensation Law ("LWCL"), La. R.S. 23:1020.1, *et seq*., an employee "relinquishes his right to be made whole in a civil suit, while the employer cedes his available tort defenses." *Benoit v. Turner Indus. Grp., L.L.C*., 11-1130, p. 7 (La. 1/24/12). 85 So. 3d 629, 634. We explained in *Champagne v. Am. Alternative Ins. Corp*., 12-1697, p. 6 (La. 3/19/13), 112 So. 3d 179, 184, that:

> . . . the Louisiana Workers' Compensation Law is a quid-pro-quo system that affords the injured worker with certain but limited benefits in exchange for the general immunity from tort liability granted to the employer. Nevertheless, the immunity provisions of the Workers' Compensation Law derogate from the delictual rights of injured workers existing in the Louisiana Civil Code, and, therefore, must be narrowly construed to make the least, rather than the most, change in the existing body of law.

*See also*, 14 Malone & Johnson, La. Civil Law Treatise –Worker's Compensation, § 361 (1980) (the LWCL "is a compromise in which the employer surrenders the

7

immunity against liability which he would otherwise enjoy in all cases in which he was without fault, and, in return, the employee loses his right to full damages for his injury and accepts instead a limited sum by way of compensation").

To implement this compromise, La. R.S. 23:1032 A(1)(a) provides that the LWCL is the exclusive remedy of an employee against his employer for injuries falling within the scope of the LWCL.[9] Consistent with this statute, our jurisprudence uniformly holds that an employee who is injured in a work-related accident "is limited to the recovery of workers' compensation benefits as his exclusive remedy against his employer and may not sue his employer, or any principal, in tort." *Brightbill v. Circuit Grand Bayou, L.L.C.*, 21-578, p. 8 (La. App. 5 Cir. 5/11/22), 342 So. 3d 127, 135.[10]

The LWCL provides certain circumstances by which a non-direct employee may recover workers' compensation benefits. One circumstance is where a "statutory employment" relationship is created. As this Court recognized in *Allen v. State ex rel. Ernest N. Morial-New Orleans Exhibition Hall Auth.*, 02-1072, p. 6 (La. 4/9/03), 842 So. 2d 373, 378,[11] in response to the concern that employers "would attempt to circumvent the absolute liability [of the LWCL] imposed by interjecting between themselves and their workers intermediary entities which would fail to meet workers' compensation obligations," the legislature adopted the "statutory

---

[9] La. R.S. 23:1032 A(1)(a) states, in relevant part: "Except for intentional acts. . ., the rights and remedies herein granted to an employee. . . on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights, remedies, and claims for damages, . . . unless such rights, remedies, and damages are created by a statute, whether now existing or created in the future, expressly establishing same as available to such employee. . . . as against his employer. . . ." La. R.S. 23:1032 A(1)(a).

[10] *See also*, *Badeaux v. St. Tammany Par. Hosp. Serv. Dist. No. 1*, 21-1229, p. 5 (La. App. 1 Cir. 6/3/22), 343 So. 3d 230, 234, *writ denied*, 22-01169 (La. 11/1/22), 349 So. 3d 1; *Prejean v. Maint. Enterprises, Inc.*, 08-0364, p. 5 (La. App. 4 Cir. 3/25/09), 8 So. 3d 766, 769; *Broussard v. Smith*, 08-473, p. 2 (La. App. 3 Cir. 12/3/08), 999 So. 2d 1171, 1173; *Evans v. Bossier Par. Sch. Bd.*, 39,718, p. 5 (La. App. 2 Cir. 5/11/05), 903 So. 2d 600, 604 ("Employers . . . are not liable in tort for an employee's injuries which occur within the scope and during the course of the employee's duties, and the employee's exclusive remedy for workplace injuries is in workers' compensation.")

[11] Citing Frank L. Maraist and Thomas C. Galligan, Jr., *The Employer's Tort Immunity: A Case Study in Post–Modern Immunity*, 57 La.L.Rev. 467, 488 (1997)).

employee" doctrine, set forth in La. R.S. 23:1061. Under this statute, when a principal engages a contractor to perform work which is a part of the principal's trade, business, or occupation, the principal is liable for compensation to any injured employee of the contractor. *Lewis v. Exxon Corp.*, 441 So. 2d 192, 196 (La. 1983).[12]

For such a relationship to exist, however, there must be a written contract between the principal and the contractor recognizing the principal as a statutory employer. *See* La. R.S. 23:1061 A(3) ("a statutory employer relationship shall not exist between the principal and the contractor's employees, . . . unless there is a written contract between the principal and a contractor . . . which recognizes the principal as a statutory employer"). A statutory employer is thus afforded immunity from tort liability for any work-related injuries of its contractor's employees. *Sibert v. Nat'l Oilwell Varco, L.P.*, 48,789, p. 12 (La. App. 2 Cir. 2/26/14), 136 So. 3d 283, 291. And, the injured statutory employee is entitled to workers' compensation benefits from the statutory employer; indeed, it is his exclusive remedy. *Fox v. Shaw Grp.*, 12-329, p. 4 (La. App. 3 Cir. 11/28/12), 106 So. 3d 200, 203.

Another circumstance by which a non-direct employee may be entitled to workers' compensation benefits (and a principal is immune from tort liability) is the focus of the main issue in this case. Ordinarily, independent contractors are excluded from the LWCL. Louisiana Revised Statute 23:1201, however, creates an exception to this rule. It provides in subpart (7) as follows:

> "Independent contractor" means any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of this Chapter *unless a substantial part of the*

---

[12] A second basis for statutory employment is under the two-contract theory, which applies when: (1) the principal enters into a contract with a third party; (2) pursuant to that contract, work must be performed; and (3) in order for the principal to fulfill its contractual obligation to perform the work, the principal enters into a subcontract for all or part of the work performed. *See Badeaux v. St. Tammany Par. Hosp. Serv. Dist. No. 1*, 21-1229, p. 9 (La. App. 1 Cir. 6/3/22), 343 So. 3d 230, 236, *writ denied*, 22-01169 (La. 11/1/22), 349 So. 3d 1.

> *work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter.*

(Emphasis added).

As expressly provided by this statute, an independent contractor who is engaged primarily in manual labor has a claim only for workers' compensation against his principal. In turn, the principal may not be sued in tort by the independent contractor. This Court explained the purpose of the manual labor exception in *Lushute v. Diesi*, 354 So. 2d 179, 182 (La. 1977):

> The obvious purpose of extending compensation coverage to an independent contractor under the circumstances described in the provision was to prevent an employer from avoiding liability under the act by contracting with an independent contractor for the execution of work undertaken by the employer which was part of the employer's trade, business or occupation. Hence, by this provision, . . . the legislature extended workmen's compensation benefits to an independent contractor . . . where a substantial part of his work time is spent in manual labor in carrying out the terms of the contract with his principal.[13]

The question of whether an independent contractor's *employees* and its *own* independent contractors fall within this exception and are thus covered by the LWCL has not been addressed by this Court. Some earlier decisions of the courts of appeal have concluded, or suggested, that the exception applies to an independent contractor's employees. In *Lumar v. Zappe Endeavors, L.L.C.*, 06-317 (La. App. 5 Cir. 10/31/06), 946 So. 2d 188, for example, the plaintiff was injured while performing cleaning services for her employer, an independent contractor of a factory. In finding that she fell within the ambit of the manual labor exception for independent contractors, the court of appeal rejected the argument made by plaintiffs

---

[13] *See also*, *Orozco v. Filser Constr.*, 18-0274, p. 8 (La. App. 4 Cir. 10/3/18), 318 So. 3d 99, 106, *writ denied*, 18-1803 (La. 2/11/19), 263 So. 3d 898 (the manual labor exception was enacted by the legislature in 1948 to prevent employers from improperly casting its employees as independent contractors so as to avoid their compensation responsibility).

in the instant case – that, as an *employee* of an independent contractor, she was not limited to workers' compensation and could sue the principal in tort.

The *Lumar* court reasoned that, because the independent contractor "performs its duties through its employees, and is liable for the acts of its employees," the "[l]imitations applicable to [the independent contractor] are also applicable to its employees." *Id.*, 06-317, p. 5, 946 So. 2d at 191. The court further observed that La. R.S. 23:1021 "does not state that it is not applicable to independent contractors who are partnerships, corporations or other juridical persons, and does not limit itself to independent contractors who are natural persons only." *Id.*, 06-317, pp. 5-6, 946 So. 2d at 191.

Other decisions extending the manual labor exclusion to employees of an independent contractor include: *Orozco*, 18-0274, p. 15, 318 So. 3d 99, *writ denied*, 18-1803 (La. 2/11/19), 263 So. 3d 898, where the court of appeal found that an employee of an independent contractor (his father's company) was entitled to workers' compensation benefits from the principal, as "an independent contractor performing manual labor;"[14] *Moss v. Tommasi Const., Inc.*, 09-1419, (La. App. 3 Cir. 5/5/10), 37 So. 3d 492, 499, where the court of appeal relied on *Lumar* to find that the employee of a subcontractor on a construction project was entitled to workers' compensation benefits from the principal, observing that "the factual relationship vis-à-vis" the injured parties and the principals in both in *Moss* and *Lumar* are "identical;" and *Courtney v. Fletcher Trucking*, 12-0434 (La. App. 1 Cir. 12/21/12), 111 So. 3d 411, where the court of appeal found that the employee of a contractor could collect workers' compensation benefits from the principal as well as his direct employer (under both the manual labor exception and the "borrowing

---

[14] The *Orozco* decision did not expressly address the issue of whether an employee of an independent contractor falls within the manual labor exception; however, it applied the manual labor exception to the employee of the independent contractor.

employer" exception,[15] although the focus of the court's discussion of the manual labor exception was on whether the plaintiff was performing manual labor).

The Second Circuit reached a different conclusion in this case. The court held that employees and independent contractors of an independent contractor do not fall within the scope of La. R.S. 23:1021 (7), finding that the statute "is limited to the independent contractor," itself. *McBride*, 55,772, p. 35, 399 So. 3d at 879. The court's decision relied heavily on a federal decision, *Jorge-Chavelas v. La. Farm Bureau Cas. Ins. Co.*, 917 F.3d 847 (5th Cir. 2019). In *Jorge-Chavelas,* the plaintiffs were employees of a company hired to plant sugarcane. They were injured when an employee of the principal/owner drove a tractor into a cart on which they were sitting. As in this case, the contract between the plaintiffs' employer and the principal reflected that they remained employees of their direct employer.

The *Jorge-Chavelas* court considered but declined to follow the various appellate decisions holding that employees of independent contractors fall within the scope of La. R.S. 23:1021 (7) and made an "*Erie* guess,"[16] as to how this Court would decide the matter. *Id.*, 917 F.3d at 850. The court first observed that an "independent *contractor* is 'one that contracts' with the principal. *See Contractor*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (also defining 'contractor' as 'a party to a bargain'"). *Id.*, 917 F.3d at 852 (emphasis supplied). The court then held that, because the plaintiffs had not contracted with the principal, they were not "independent contractors" within the meaning of the manual labor exception.

---

[15] The "borrowing employer" exception is another manner by which a principal may be liable in workers' compensation. As set forth in La. R.S. 23:1031(C), "a 'borrowing' or special employer can be held liable for compensation benefits where the employee is under the control and direction of the borrowing employer in the performance of the work." *Barrios v. Lambar, Inc.*, 06-0324, pp. 5-6 (La. App. 1 Cir. 12/28/06), 951 So. 2d 323, 327. No argument was made that plaintiffs were Enable's borrowed employees.

[16] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

As further support for its holding, the *Jorge-Chavelas* court noted that the "statute excepts only an independent contractor for whom a substantial part of his work is 'spent in manual labor by *him* in carrying out the terms of *the contract*.'" *Id*. (Emphasis supplied). The Fifth Circuit looked as well to *Lushute*, *supra*, where this Court "remarked that the [manual labor] exception was meant to extend to a contractor engaged in manual labor 'in carrying out the terms of *his contract with the principal*.'" *Id*. (citing *Lushute*, 354 So. 2d at 182) (emphasis supplied).

The court reasoned that the *Lushute* decision:

> . . . suggests the state high court would adopt this natural reading—that the statute covers only contractors themselves—rather than Farm Bureau's more expansive one. And that comports with the Louisiana Supreme Court's general approach to workers' compensation laws. When interpreting the immunity afforded employers, "every presumption should be on the side of preserving the general tort or delictual rights of an injured worker against the actual wrongdoer, in the absence of explicit statutory language limiting or excluding such rights."

*Id*. (Citation omitted).

In this case, the court of appeal relied on *Jorge-Chavelas* and held:

> We find the *Erie*-guess analysis in *Jorge-Chavelas* to be persuasive. We are also mindful that because the workers' compensation statutes are in derogation of the universal right to sue for damages provided by La. C.C. art. 2315, the immunity provisions must be strictly construed. *French v. Claiborne Parish Police Jury*, 52,192 (La. App. 2 Cir. 6/27/18), 251 So. 3d 571, *writ denied*, 18-1470 (La. 11/20/18), 257 So. 3d 188. Therefore, we conclude that the manual labor exception presented in La. R.S. 23:1021(7) is limited to the independent contractor and not that independent contractor's employees or its independent contractors.

*McBride*, 55,772, pp. 34-35, 399 So. 3d at 859.[17]

---

[17] The manual labor exception was recently considered in *Naquin v. Church Mut. Ins. Co*., 24-0303, p. (La. App. 1 Cir. 12/30/24), 403 So. 3d 1188. There, the plaintiff, an employee of an independent contractor/franchisee retained to perform cleaning services at a school, was injured on the job and filed suit against the school, among others. The school moved for summary judgment on the basis that it was entitled to tort immunity under La. R.S. 23:1021 (7), arguing that the plaintiff was an independent contractor performing manual labor. The court ultimately found no error in the trial court's denial of summary judgment because the school did not carry its burden

This Court is not bound by decisions of federal courts concerning questions of state law. However, we review those decisions carefully to see if they provide compelling analyses of state law issues. *FIA Card Servs., N.A. v. Weaver*, 10-1372, p. 7 (La. 3/15/11), 62 So. 3d 709, 714. As we observed in *Police Jury of Calcasieu Par. v. Indian Harbor Ins. Co.*, 24-00449, p. 12 n.13 (La. 10/25/24), 395 So. 3d 717, 727, "we may find their rationale persuasive and concur with their decisions." Such is the case here. We agree with the Second Circuit and are likewise persuaded that *Jorge-Chavelas* provides a proper interpretation of La. R.S. 23:1201 (7).

Most importantly, as discussed below, we find the statutory language of La. R.S. 23:1201 (7) to be clear and unambiguous: the manual labor exception applies only to an independent contractor who has contracted with a principal to perform work, where a substantial part of the work time is in manual labor. Where an independent contractor's direct employees have not entered into a contract with the principal, the employees are not the principal's "independent contractors" for purposes of the manual labor exception. This principle applies equally to the independent contractor's own independent contractors. Accordingly, the employees and independent contractors of an independent contractor are not covered by the manual labor exception and may assert tort claims against a principal.

This issue involves the interpretation of statutes. Accordingly, we review the well-settled rules of statutory interpretation. "The starting point for the interpretation of any statute is the language of the statute itself." *Bergeron v. Richardson*, 20-01409, p. 3 (La. 6/30/21), 320 So. 3d 1109, 1111 (citation omitted). When a law is

of proof that the plaintiff "spent a substantial part of her work time in manual labor in carrying out the terms of a contract between her and [the school] and that the work performed by [plaintiff] is part of [the school's] trade, business, or occupation, thereby entitling [the school] to tort immunity." *Id.*, 24-0303, p. 12, 403 So. 3d at 1203. Importantly, however, the *Naquin* court suggested that the manual labor exclusion would not have barred the plaintiff's tort suit otherwise. The court discussed *Jorge-Chavelas* at length and observed that the plaintiff did not have an express or implied contract with the school. The court affirmed the plaintiff's damages award against the school.

clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9. "[A]bsent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language," giving "the words of a law their generally prevailing meaning." *Cleco Evangeline, LLC v. Louisiana Tax Comm'n*, 01-2162, p. 5 (La. 4/3/02), 813 So. 2d 351, 354. Further, it is presumed that "every word, sentence or provision in a statute was intended to serve some useful purpose, that some effect be given to each such provision, and that the Legislature used no unnecessary words or provisions." *Bergeron*, 20-01409, p. 5, 320 So. 3d at 1113.

The manual labor exception defines an "independent contractor" as "any *person* who renders service, other than manual labor. . . ." (Emphasis added). It specifically affords workers' compensation benefits where a "substantial part of the work time of *an* independent contractor is spent in manual labor *by him*. . . ." La. R.S. 23:1021 (7). (Emphasis added). It thus applies to "*an*" independent contractor (in the singular) where the manual labor is performed "*by him*" (also singular). We find the statutory language clear and unambiguous. The manual labor exception applies only to independent contractors, and not to their employees or their own independent contractors. Had the legislature intended for an independent contractor's employees to be covered as well, it could easily have included language to that effect.

Furthermore, the manual labor exception clearly contemplates that the exception applies only to independent contractors with whom the principal has entered into a contractual relationship. Its language is unambiguous. It applies where "a substantial part of the work time of an independent contractor is spent in manual labor by *him* in carrying out the terms of the contract." (Emphasis added). Again,

15

the legislature could simply have added that the exception applies where the manual labor is performed by "him *and his employees* in carrying out the contract."

Although the term "contractor" is not defined in La. R.S. 23:1021 (only "independent contractor is defined"), we look to its generally prevailing meaning. Our jurisprudence indicates that dictionaries "are a valuable source for determining the common and approved usage of words." *Kazan v. Red Lion Hotels Corp.*, 21-01820, p. 4 (La. 6/29/22), 346 So. 3d 267, 271. Consistent with our finding that La. R.S. 23:1201 (7) is limited to independent contractors with whom a principal has contracted, Merriam-Webster defines "contractor" as:

> 1: one that contracts or is party to a contract: such as
>
>> a: one that contracts to perform work or provide supplies.[18]

Our finding that the employees of an independent contractor are not included in the manual labor exception applies equally to an independent contractor's own independent contractors. We see no material difference between an independent contractor's employees and its independent contractors for purposes of the manual labor exception. Absent a contract with the principal, the latter is not the principal's "independent contractor."

While our finding that the manual labor exception grants workers' compensation benefits from a principal only to the independent contractor, and not to his employees, may seem "at first glance puzzling," as observed by H. Alston Johnson, III, Louisiana Workers' Compensation Law and Practice, 13 La. Civ. Law Treatise, § 78 (5th ed.), "[o]n further reflection, any apparent injustice disappears:"

> It is well to remember that the independent contractor spending a substantial part of the work time in manual labor carrying out the contract is not an employee of the

---

[18] *See* https://www.merriam-webster.com/dictionary/contractor. Notably, too, under the definition of "independent contractor" of the Internal Revenue Service, "*an individual* is an independent contractor if *the person* for whom the services are performed has the right to control or direct only the result of the work and not what will be done and how it will be done." (Emphasis added). *See*: https://www.irs.gov/businesses/small-businesses-self-employed/independent-contractor-defined.

16

principal, but is to be treated as if he were for compensation purposes.

\* \* \*

. . . the policy that underlies La. R.S. 23:1021(6) [now La. R.S. 23:1021(7)] (granting the "contractor" doing manual work the same rights as the direct employee) is entirely different [from that of La. R.S. 23:1061 (statutory employment)].[19] This section was added because the former distinction between contractor and employee had become so tenuous and so difficult to administer that the cases were in a state of almost hopeless confusion, and many injustices were apparent. . . . The new provision was added in order to relieve the courts of this difficulty by requiring that all manual workers be treated the same, whether they were regarded technically as contractors or employees. The court, by entitling the contractor to the more liberal approach on this matter, does not in any way detract from any entitlements formerly enjoyed by the contractor's employee, who still retains the right to proceed against his own employer, the contractor [for workers' compensation benefits].

A principal who seeks to avoid tort liability for the injuries of its independent contractor's employees and their independent contractors is not without recourse. The LWCL sets forth a straightforward and uncomplicated method by which a principal may avail itself of the protection provided by the LWCL. As noted herein, La. R.S. 23:1061 is the basis of "statutory employment." Although statutory employment renders a principal responsible in workers' compensation, it also provides corresponding tort immunity. *See Allen,* 02-1072, p. 6, 842 So. 2d at 378. To avail itself of this immunity, however, a written contract is required, which

---

[19] The purpose of "La. R.S. 23:1061, which requires that the work done by the contractor must be part of the business of the principal before the contractor's employee is entitled to compensation from the latter" was explained as follows: "Ordinarily a principal is not and should not be subjected to the compensation claims of his contractor's employees. The compensation burden in such instances properly rests upon the contractor himself. It is only when the principal seeks to avoid his compensation obligation by farming out part of his own normal operations to a contractor that an evil arises requiring exceptional treatment. Otherwise, the compensation obligation should rest on the contractor alone. If, then, repair work on business premises is customarily done by specialized contractors, there is no sound reason why the principal should be directly responsible to the contractor's workers. He has in no way sought to avoid his normal compensation responsibility through resort to the use of a contractor as intermediary."

*Id.* (Footnote omitted).

recognizes the principal as the statutory employer. *See Badeaux*, 21-1229, p. 6, 343 So. 3d at 235.

Here, there is no dispute that no contract exists by which Enable became plaintiffs' statutory employer. Indeed, the contract between Enable and White Oak made clear that no statutory employment arrangement was contemplated, explicitly specifying that White Oak "is an independent contractor" and that White Oak's "personnel w[ould] not be considered employees of" Enable.

We are not persuaded by Enable's argument that the cases suggesting that the manual labor exception applies to an independent contractor's employees constitute *jurisprudence constante* which must be followed by this Court. We recognize that "a long line of cases following the same reasoning within this state forms *jurisprudence constante*." *Bergeron*, 20-01409, p. 7, 320 So. 3d at 1114 (internal citation omitted). Under our civilian tradition, "while a single decision is not binding on our courts, when a series of decisions form a 'constant stream of uniform and homogenous rulings having the same reasoning,' *jurisprudence constante* applies and operates with 'considerable persuasive authority.'" *Doerr v. Mobil Oil Corp.*, 00-0947, p. 14 (La. 12/19/00), 774 So.2d 119, 128, (citing James L. Dennis, *Interpretation and Application of the Civil Code and the Evaluation of Judicial Precedent*, 54 La. L.Rev. 1, 15 (1993)).

We do not find a sufficient line of consistent or uniform cases on this issue demonstrating *jurisprudence constante* and we are therefore not compelled to follow the few prior decisions. Likewise, as we noted in *Bergeron*, "when a statute specifically disposes of an issue, resort to jurisprudence is unnecessary." *Bergeron*, 20-01409, p. 9, 320 So. 3d 1116. Louisiana Revised Statute 23:1201 (7) specifically disposes of the issue and clearly and unambiguously applies only to an independent contractor who has a direct contract with a principal. We need not resort to jurisprudence when the statute is clear.

18

Based on the foregoing, we find that the manual labor exception set forth in La. R.S. 23:1201 (7) does not apply to the plaintiffs' claims and does not afford Enable immunity from this suit. Accordingly, the plaintiffs' claims in this matter sound in tort rather than workers' compensation.

### *Allocation of fault*

The trial court assigned 90 percent fault for the incident to Enable and 10 percent to White Oak. Enable's fault was based largely on the trial court's finding that, although Enable took some precautions, it "failed to remove all the ethylene glycol from the area where hot work was being performed, thus resulting in a catastrophic event caused by the combustion of the ethylene glycol." *McBride*, 55,772, p. 25, 399 So. 3d at 874. The trial court further found that Enable failed to ensure that White Oak was familiar with its policies and procedures, which were only available "through an overly burdensome online process through links hidden in the fine print of the bid process and electronic links of policy within policy." *Id.*, 55,772, p. 26, 399 So. 3d at 874. Likewise, the trial court found that Enable also violated its own policy by failing to have a copy of its policies and procedures manual onsite.

The trial court noted that White Oak "was operating under the assumption that Enable [provided] safe work conditions for the hot work that Enable authorized." *Id.* However, it found fault on White Oak's part for two reasons. First, White Oak failed to train its employees and provide them with a copy of Enable's policies and procedures. Second, White Oak's employees should have known of the possibility that the liquid they observed leaking from the glycol cooler could be hazardous, yet they failed to stop the hot work and notify Enable of the potential work hazard.

The court of appeal affirmed the trial court's allocation of fault, finding the 90 percent fault assigned to Enable to be "within the acceptable range." *Id.*, 55,772, p, 42, 399 So. 3d at 883. As concerns Mr. Dowdy's fault, the court of appeal

observed: "Any fault potentially attributable to Dowdy was surely considered by the trial court when it allocated 10% of fault for the rupture to White Oak." *Id*. The trial court found no merit to Enable's argument that the trial court should have applied the doctrine of superseding and intervening cause with respect to Mr. Dowdy's failure to stop the work when he recognized a potential hazard.[20]

Enable contends that the lower courts manifestly erred in the allocation of fault, arguing that the incident was caused solely by the negligence of White Oak's employees. It maintains that, under Louisiana law, a principal is not liable for the negligence of its independent contractors except where: (1) the independent contractor's work is ultra-hazardous, or (2) where the principal reserves the right to supervise or control the work of the independent contractor.[21] It further argues that White Oak was required by the terms and conditions of the contract (available by link to Enable's website) to "comply with all safety and security rules and requirements. . . and take all precautions required to prevent injury to persons. . . during such installations or work."

Enable also contends that the lower courts improperly imposed upon it a duty to intervene and correct White Oak's work practices, when its duty was "to exercise reasonable care for the safety of persons on the premises." Enable argues that its duty did not "encompass requiring Enable to conduct preparatory acts that would make [t]orch cutting, which White Oak did not plan to perform until immediately

---

[20] In the appeal before this Court, although Enable commented that "Dowdy's and White Oak's decision to proceed to perform their chosen work method despite recognizing the hazard [was] an intervening and superseding cause of the Incident," it made no further argument on this issue. Nevertheless, we find no error in the trial court's failure to apply this doctrine. "[I]t has generally been held that the initial tortfeasor will not be relieved of the consequences of his or her negligence unless the intervening cause superceded the original negligence and alone produced the injury." *Adams v. Rhodia, Inc.*, 07-2110, p. 14 (La. 5/21/08), 983 So. 3d 798, 808. The lower courts did not find White Oak's negligence to be the sole cause of the incident or plaintiffs' injuries. Nor do we, as discussed herein. The intervening and superseding cause doctrine does not apply.

[21] In support, Enable cites *Thompson v. Winn-Dixie Montgomery, Inc.*, 15-0477 (La. 10/14/15), 181 So. 3d 656; *Ledent v. Guar. Nat. Ins. Co.*, 31,346 (La. App. 2 Cir. 12/28/98), 723 So. 2d 531; and *Klein v. Cisco-Eagle, Inc.*, 37,398 (La. App. 2 Cir. 9/24/03), 855 So. 2d 844.

before taking action and causing the [i]ncident, safe." Enable maintains it issued the hot work permit without knowledge that White Oak would use a torch to cut the pipe and "before White Oak identified that glycol remained in the Pipe."

Enable likewise argues that some fault should have been assessed against Mr. Dowdy. It urges this Court to review this issue *de novo*, citing *Chambers v. Vill. of Moreauville,* 11-898, p. 4 (La. 1/24/12),  85 So. 3d 593, for the principle that, where legal errors interdict the fact-finding process, the manifest-error standard of review no longer applies.

We agree with the general rule that a principal is not liable for the negligence of its independent contractors and owes no duty to oversee the work of an independent contractor (unless it reserves the right to supervise or control or gives express or implied authorization to an unsafe practice). *Thompson v. Winn-Dixie Montgomery, Inc.*, 15-0477, pp. 4-5 (La. 10/14/15), 181 So. 3d 656, 661). However, this does not absolve a principal of its own independent negligence.  Louisiana Civil Code article 2323 makes clear that the fault of all parties must be considered.[22] Thus, while Enable cannot be held accountable for White Oak's negligence, it is answerable for its own negligence. *See Thompson*, 15-0477, 181 So. 3d 656. We note, however, that the trial court did not assess any fault to Enable based upon White Oak's negligence under any theory. Its fault was based solely upon its own negligence.

A trial court's allocation of fault is a factual determination subject to a manifest error standard of review.  *Malta v. Herbert S. Hiller Corp.,* 21-00209, p. 21 (La. 10/10/21), 333 So. 3d 384, 401. "The allocation of fault is not an exact science

---

[22] La. C.C. art. 2323 provides, in relevant part: "In any action for damages where a person suffers injury, . . . the degree or percentage of fault of all persons causing or contributing to the injury, . . . shall be determined. . . . [These] provisions . . . shall apply to any claim for recovery of damages . . . asserted under any law or legal doctrine or theory of  liability, regardless of the basis of liability."

21

or the search for one precise ratio, instead it is the search for an acceptable range; an allocation by the factfinder within that range cannot be clearly wrong." *Id.*

### *Enable's fault*

Although the lower courts found numerous failures on Enable's part, there are two main failures on its part that contributed to the incident.[23] First, hazardous substances remained in the area where White Oak was to perform work. Prior to the commencement of any work, Enable performed a lockout/tagout procedure and drained the glycol cooler of a substantial amount of glycol. It is obvious, however, that some hazardous material remained in the system. Indeed, Jeffrey Caskey, Enable's then-process safety management coordinator who investigated the incident, testified that the lean glycol booster pump discharge line had not been purged. Mr. Nickerson's testimony, too, confirms that there was insufficient purging. He indicated that, when they (eventually) "took the cooler off," "glycol and fluids went everywhere."

Second, Enable issued a hot work permit confirming that the lockout/tagout procedure had been followed and that "flammable liquids and vapors [had] been isolated or rendered safe." The purpose of the hot work permit, according to Mr. Caskey, was to "isolate and eliminate sources of potential energy during work" so as to "render an area safe." Again, contrary to the assurances of the hot work permit,

---

[23] Much emphasis was placed on the fact that the contract's terms and conditions, as well as Enable's policies and procedures, and contractor's safety manual, were only available through links to its website (which the trial court found to be overly burdensome). Emphasis was also placed on Enable's failure to ensure White Oak was familiar with its policies and procedures and to have its policies and procedures manual onsite.

While we recognize that these are failures on Enable's part, it is unclear how those failures impacted the work to be conducted, or what specifically in those policies and procedures or terms and conditions would have prevented the incident. To the extent that these various documents set forth the policy that any person could stop work when there was an unsafe condition, the record reflects that Mr. Dowdy, the person who detected a potential hazardous condition, was well aware that he had authority to do so. Similarly, the hot work permit expressly stated that "[a]ny person may stop a work activity, if in their opinion, conditions are no longer safe."

it is clear that some hazardous materials remained in the area and it was not safe for the use of a torch.

In his investigation of the incident, Mr. Caskey identified several problems which he attributed to the incident. First, although LEL readings were measured and recorded on the work permit, no LEL readings were taken inside the glycol surge tank (which ultimately ruptured) or the piping that was to be cut.[24] Second, Mr. Caskey found that Enable did not perform the lockout/tagout procedure properly, insofar as "it was determined at the time that the lean glycol system did not present a flammable hazard. But, had the Lockout Tagout been in place the surge tank would likely not ruptured." Mr. Caskey also noted a bypass valve was left open,[25] allowing air into the system, and the system was not purged with nitrogen, an inert gas that would have rendered the atmosphere non-flammable.[26]

Enable's expert in workplace health and safety, and regulatory standards of care, Marshall Krotenberg, gave his opinion about the cause of the rupture – that "the use of a cutting torch on a pipe that contained triethylene glycol was sufficiently heated to boil and generate vapors that ignited and caused an over pressurization of the system and blowout of one end of the surge tank." Mr. Krotenberg opined that White Oak had the responsibility to protect its employees, as required by the Occupational Safety and Health Administration ("OSHA"). Furthermore, consistent with OSHA standards, the hot work permit allowed anyone to stop work if it was felt that conditions were no longer safe. Mr. Krotenberg further testified that Enable

---

[24] Indeed, Mr. Garrett, who signed the lockout/tagout documentation, acknowledged that he did not take any LEL readings inside the surge tank where the rupture occurred.

[25] Mr. Woodard, too, indicated that one surge valve had not been locked out, which was improper. According to John Hemus, a White Oak welder, he saw that there were some valves to the surge tank that had been left open. He brought that up with Enable operators but was assured that this would not present a problem because everything else had been locked out/tagged out and "blown down."

[26] Ms. McBride testified to her understanding that Enable would purge the pipes with nitrogen. Mr. Hemus also testified that White Oak requests that some kind of inert gas be used to purge a system but sometimes customers do not always comply.

relied on White Oak, as the manufacturer of the system, to have knowledge about glycol liquids and to know how to work around them safely.

In Mr. Krotenberg's opinion, White Oak's failure to verify safe conditions (such as ensuring no residual glycol was in the pipe or choosing a different method to separate the pipe) prior to performing hot work caused the incident. Another factor was Nickerson's failure to verify safe conditions prior to performing hot work, especially as a welder in the oil and gas industry.

Mr. Krotenberg conceded on cross-examination that Mr. Garrett did not take any readings from inside the surge tank, that Enable should have provided White Oak with a safety handbook, and White Oak and/or Enable should have known of the residual glycol. He also conceded White Oak understood from Enable that the glycol piping was "free from reasonably recognized fire hazards." He further agreed that Enable's purging was not adequate "to control the hazardous condition created by putting heat on the pipe" and that pushing air through a system is not the proper means of purging when hot work is involved. However, Mr. Kronenberg did not believe that the substance in the pipe was the hazard; rather, the hazard was "putting the torch to the pipe."

Plaintiffs' safety process expert, Michael Sawyer, testified that, although Enable's safety policies and procedures met OSHA standards, Enable violated them, as well as industry standards, with respect to the issuance of the hot work permit. He stated that "[a]ny time you have an explosion or rupture of a process vessel like this, you have violated one of the process safety guidelines." According to Mr. Sawyer, it was Enable's responsibility to ensure that everything was clear, purged and safe to cut. He indicated that "the final check of that is done with the hot work permit which, again, is an Enable document and authorized by an Enable employee."

Mr. Sawyer also found Enable's failure to have its own employees attend White Oak's JSA to be a violation of its policies and procedures. Like Mr.

24

Krotenberg and Mr. Woodard, Mr. Sawyer further agreed that certain valves were left open that should have been shut and that the use of an inert gas would have cleared all of the hazardous materials. He stated:

> . . . one of the first things [Enable] did that is just unfathomable is that [Enable] tried to purge with air [rather than an inert gas]. You never introduces air into a system like this. . . . all you're doing is creating a bomb. You do it with nitrogen, something that's inert."

Mr. Sawyer, too, noted that no internal readings were taken of the piping or surge tank.[27] In his opinion, contractors, like White Oak, may rely on owners of facilities to ensure the safety of their work.

The foregoing clearly establishes a basis for the trial court's finding of fault on Enable's part. Enable maintains it was unaware that White Oak employees would be using a torch to cut the piping. It is clear, however, that hot work permits are issued only when there is "hot work," that is, work which may produce a spark. Logically, when it issued the hot work permit, Enable knew or should have known that White Oak would be engaging in hot work. As Mr. Sawyer testified, it was not necessary for White Oak to specify that a torch would be used. He stated that, because Enable issued a hot work permit, "any type of mechanism that employed hot work was deemed acceptable."

***White Oak's fault***

While Enable's actions contributed to the incident, it was not alone. The record also fully supports the finding of negligence on White Oak's part. Although there was ample evidence in the record that White Oak relied on Enable to ensure that the area was safe, it is clear that, before Mr. Nickerson began to cut the piping with the torch, there were direct signs that should have alerted the parties that the

---

[27] Although Ms. McBride testified that she observed an Enable employee and White Oak employees take readings from inside the pipe and did not detect anything, there was no testimony that readings were taken from the surge tank.

area may not be safe for hot work. Mr. Dowdy testified that when he arrived at the area, he noticed a spill under Mr. Nickerson's ladder, which had "spilled from the piping." Mr. Dowdy did nothing to investigate what the liquid was but simply planned to "keep an eye on the liquid to make sure it didn't catch fire."

Mr. Dowdy testified he was fully aware that, if he saw anything he felt to be unsafe he could stop the work. In fact, Mr. Dowdy indicated that he had noticed a bigger spill "down at the amine coolers, when they pulled them out and set them down" at which time, he "pulled [his] stop work authority down there on the amine coolers."[28]

Although he was White Oak's independent contractor, Mr. Dowdy is a seasoned, experienced welder, who understood the purpose of hot work permits. He testified that a hot work permit "make[s] sure when you strike your torch or your welding machine up there's no gas or nothing that could harm and cause an accident." His testimony also reflected that he had specific knowledge of the glycol system.[29] While Mr. Dowdy indicated that he had been told by a White Oak employee that "it had been purged properly and that everything was on go," his failure to stop the work to investigate the liquid pooling under Mr. Nickerson's ladder was a substantial contributing factor in the incident.

Mr. Nickerson, too, as an experienced welder who was familiar with hot work permits and lockout/tagout procedures, should also have been aware of the potential hazard presented by an unknown liquid pooling under his ladder. While he testified that a sniffer was "stuck inside the glycol cooler and nothing was found where he

---

[28] It is unclear whether Mr. Dowdy stopped the work at the amine coolers prior to rupture at the glycol system.

[29] Mr. Dowdy's knowledge of the glycol system was evident from his testimony that "glycol separates oil, water and gas. . . [T]his had natural gas remnants in it . . . It goes through a glycol tower and it separates the gas, water and oil. . . ." Mr. Dowdy also testified that "purging is a big deal" and that the use of nitrogen to render everything inert was the "rule of thumb," " the golden rule."

was cutting" and that a "reading was taken inside the pipe about four feet from where he was cutting, but nothing was measured,"[30] it is clear that these measures were insufficient to verify the safety of the hot work. Again, the record reflects that no readings were taken of the glycol surge tank.

We also note that White Oak was the manufacturer of the glycol system at the Magnolia plant (both the original and the replacement glycol tanks). White Oak's employees thus either knew or should have known of the dangers presented by the presence of glycol as well as the proper use of incendiary devices around flammable substances. Similarly, it was White Oak's responsibility to ensure that its employees and its independent contractors were trained for the work they were to perform.

Moreover, there was testimony that White Oak had taken a reading that showed a less than 10 percent LEL reading but did not document this. According to Mr. Sawyer, an LEL reading should be at zero and, even where an LEL level is only between one and ten percent, all operations must be stopped immediately. Mr. Sawyer further testified that, if an LEL limit above zero is noted, "the hot work permit. . . is void, or they just don't complete it and authorize it."

Thus, the record demonstrates the incident resulted from two main factors: the presence of a combustible substance in the glycol cooler system and the use of an acetylene torch to cut the piping. The presence of a combustible substance can only be attributed to Enable, whose responsibility it was to ensure the area had been purged, properly locked out/tagged out, and was safe for the work to be performed. The use of the torch, when the possibility of a hazardous substance was more than apparent, is attributable to White Oak. Although Enable issued a hot work permit leading White Oak's employees to believe it was safe to perform hot work, White Oak's employees should have recognized the possibility that the liquid substance

---

[30] *McBride*, 55,772, p. 16, 399 So. 3d at 870.

under the glycol cooler could have been hazardous and stopped the work to investigate further. White Oak had an opportunity to avoid the incident by stopping the work when suspicions were elevated based on what was seen on the premises before the hot work began.

Enable was clearly at fault. When one performing labor is advised a hot work permit has been issued, there is some reluctance to question the validity of the permit. Nevertheless, White Oak's negligence is not insignificant. For this reason, we find the trial court manifestly erred in its allocation of fault in assigning only 10 percent fault to White Oak. We thus find that fault should be reallocated. As instructed by *Malta*, "the percentages of fault shall be adjusted to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." *Malta*, 21-00209, p. 31, 333 So. 3d at 407.

In reallocating fault:

> this court must consider the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. *See Watson* [*v. State Farm Fire and Cas. Ins. Co.*], 469 So.2d [967,] 974 [La. 1985]. In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Id.,* 21-00209, p. 31, 333 So. 3d at 407.

Based on our review of the record, we find that that the highest amount of fault that a reasonable factfinder could have assessed against Enable is 70 percent, while the lowest amount of fault that a reasonable factfinder could have assessed against White Oak is 30 percent.

28

### Mr. Dowdy's injury claim

Last, we address Enable's contention that Mr. Dowdy did not meet his burden of proving, more probably than not, that he was injured in the incident. Enable points to a lack of evidence that Mr. Dowdy suffered hearing loss from the incident and Mr. Dowdy's extensive history of neck injuries for which he received treatment.

As to the hearing loss claim, the trial court found the testimony and evidence demonstrated that Mr. Dowdy did not have hearing loss prior to the incident. As such, it held that the "*Housley* Presumption" applied and awarded Mr. Dowdy damages for hearing loss. Enable maintains there is no evidence in the record showing that Mr. Dowdy was diagnosed with hearing loss or that the incident caused hearing loss. Absent any medical evidence, and citing *Harig v. State, Bd. of Elementary & Secondary Educ.*, 635 So. 2d 485 (La. App. 2 Cir., 1994), Enable argues the *Housley* presumption does not apply.

Under *Housley*, when a plaintiff can show he was in good health prior to an accident and symptoms appear thereafter, there is a presumption that the injuries resulted from the accident, provided that medical evidence demonstrates "a reasonable possibility of causal connection between the accident and the disabling condition." *Housley*, 579 So. 2d at 980.[31] The court of appeal found that the *Housley* presumption applied, noting:

> Dowdy testified that he did not notice that he had any hearing issues until he got home from the Magnolia job. His claim of hearing loss is somewhat corroborated by other witnesses. Miller testified that he remembered that Dowdy was talking funny after the rupture and said he could not hear Miller. McBride testified that Dowdy had his earplugs in. She described the rupture, at a couple of points, as making a deafening sound. She testified that Dowdy complained to her about his ears and his back immediately after the explosion.

---

[31] In the recently concluded legislative session, the "*Housley* Presumption" was statutorily abrogated. *See* Acts 2025, No. 18, § 1, effective May 28, 2025.

*McBride*, 55,772, p. 56, 399 So. 3d at 889.

At trial, Mr. Dowdy introduced the testimony of Michael Roach, who fitted him with hearing aids. Mr. Roach's testimony had been limited by the trial court's grant of Enable's motion in limine and he was precluded from any testimony related to the "cause and diagnosis of any alleged hearing loss" of Mr. Dowdy. Although Mr. Roach did not offer any opinions as to the cause of Mr. Dowdy's hearing loss, and agreed he is not licensed to diagnose the cause of hearing loss, he is licensed to test for and dispense hearing aids.[32]

In Mr. Dowdy's case, Mr. Roach happened to test Mr. Dowdy in 2017, when he brought his father-in-law for a hearing exam. At that time, Mr. Dowdy had normal hearing and no hearing loss. When Mr. Roach next tested Mr. Dowdy on June 18, 2018, almost two weeks after the accident, he detected hearing loss and fitted Mr. Dowdy with hearing aids.

Ms. McBride was questioned as to whether Mr. Dowdy reported any injuries from the incident and she responded: "His ears. And his back; he was feeling really unwell in a general sense. But definitely his ears." Mr. Miller testified that, after the accident, Mr. Dowdy was "talking funny" and could not hear him.

Based on the foregoing, our review of the record demonstrates no manifest error in the trial court's finding that Mr. Dowdy suffered hearing loss as a result of the incident or in the application of the *Housley* presumption. *See Detraz v. Lee*, 05-1263, p. 9 (La. 1/17/07), 950 So. 2d 557, 563 ("the application of the '*Housley* presumption' is a factual issue as is the determination of causation, both of which are subject to the manifest error standard of review."). *Harig*, the case on which Enable relies, does not support its position in this matter. In *Harig*, there was a

---

[32] According to Mr. Roach, fitting and dispensing of hearing instruments is defined by the Texas Occupational Code (which governs Mr. Roach's licensing) as "the measurement of human hearing by the use of an audiometer or other means to make selections, adaptations or sales of hearing instruments."

complete lack of evidence of hearing loss; the only evidence was the plaintiff's claims of a decrease in hearing. Although the plaintiff asserted there were "audios" from a doctor documenting his hearing loss, he did not submit any reports from that doctor or any other corroborating evidence. Accordingly, the *Harig* court found an "absence of medical evidence linking the accident and the disability." *Id.*, 635 So. 2d at 493.

Turning to Mr. Dowdy's cervical spine injuries,[33] the trial court found that, although Mr. Dowdy had preexisting cervical spine issues, all of his treatment ceased prior to the incident and Mr. Dowdy was "in relatively good health." After the incident, new findings were discovered in his cervical spine that were not preexisting. Thus, the trial court applied the *Housley* presumption to the new injuries and awarded damages.

The court of appeal thoroughly reviewed Mr. Dowdy's medical records, including those from his treatment after a March 2014 automobile accident. It then found that, given Mr. Dowdy's extensive and even recent medical history of neck and back problems, the trial court was clearly wrong in its determination that he had been in relatively good health prior to the incident. As such, the *Housley* presumption did not apply. However, the court of appeal affirmed the trial court's award of damages for Mr. Dowdy's cervical spine injuries, finding that the evidence otherwise supported the trial court's conclusion that "that it was more probable than not" that the incident exacerbated Mr. Dowdy's condition, requiring surgery. *McBride*, 55,772, p. 55, 399 So. 3d at 889.

Enable contends that the trial court's award should be set aside on several bases. First, Mr. Dowdy did not report any injuries on the date of the accident or for nine days thereafter while working at the plant. Nor did he resume treating for his

---

[33] Again, we address only Mr. Dowdy's hearing loss and cervical spine injuries. His lumbar spine injuries are not at issue in this appeal.

"pre-existing injuries" until September 2018, three months later. Further, Mr. Dowdy testified that neck surgery had been recommended to him after a 2014 automobile accident but he never had the surgery because "there wasn't enough money" from the settlement of his 2014 claim.

At trial, Mr. Dowdy conceded that he was still having some neck pain at the time of the June 2018 incident but was able to continue "pipelining" and was managing fine. After the incident, he experienced a different sort of pain and in different areas, and the pain "grew over time." While he did have numbness in his left arm prior to the incident, it worsened after the incident. Mr. Dowdy did not miss work because he "can't be off work for that long," as he "has a family to feed." Likewise, while he suffered headaches prior to the incident, he only developed migraines after it. According to Mr. Dowdy, he had difficulty finding doctors and went for periods of time without seeing anyone.

The record demonstrates that Mr. Dowdy received medical care following a 2014 accident at Care First and had a cervical spine MRI in April 2014, that was interpreted by Dr. Charles Gordon as showing various degenerative and spondylytic changes at several levels, with some disc disruption-type changes at the C6-C7 level. Dr. Gordon noted at the time that he would consider cervical surgery after Mr. Dowdy recovered from lumbar surgery, which was performed in June 2014.

Mr. Dowdy returned to Care First on April 25, 2017, reporting neck pain and headaches. He was given several injections which provided temporary relief. He continued to be seen at Care First on a roughly monthly basis from then until February 2018 for both neck and back complaints. During this time, he had a cervical epidural injection on June 19, 2017.

According to Mr. Dowdy, when he left a job in February 2018, he lost his health insurance and stopped receiving medical care although he indicated that he continued to have pain.

After the incident, Mr. Dowdy resumed treatment at Care First on September 17, 2018, at which time he reported the symptoms resulted from the June 6, 2018 incident. He underwent a bilateral occipital nerve block that day for headaches and neck pain, as well as multiple trigger point injections because of spasms and pain over the paravertebral muscles of the cervical spine region. When next seen at Care First in October 2018, Mr. Dowdy continued to complain of neck pain, although he reported the injections were "moderately helpful with headaches."

Mr. Dowdy was seen in November 2018 by Dr. Simon Tan of A-Medical Advantage Healthcare Systems and had another cervical MRI as well as a brain MRI on December 8, 2018. He was again seen by Dr. Tan in December 2018 and in February, March, and by another A-Medical physician in April 2019. He then returned to Care First in July 2019 at which time his MRI was reviewed and was noted to show numerous concerns from the C3-4 level through the C7-T1 levels. He again received multiple trigger point injections and was advised to consult with a spine surgeon. He was also seen at Neurology and Headache Center in July 2019 reporting neck pain and migraines.

In October 2019, Mr. Dowdy was seen twice at Shreveport Doctors Rehab for complaints to his right pinky finger, which "stayed in a flexed position" and could not be extended without assistance. The medical reports from those visits also noted radiculopathy in the cervical region and a sprain of ligaments in the cervical spine, as well as reports of hearing loss. At that time, Mr. Dowdy reported that the injections he had received "did not help with the pain." Bilateral trigger point cervical injections were recommended.

In January 2020, Mr. Dowdy saw a physician at InjuryMD for cervical pain radiating to his left upper extremity (and lumbar pain), relating his pain to the incident at Enable's plant. He was then seen at Longview Spine & Sports Medicine

33

in March 2020 and at UT Health in May 2020 and January 2021, for multiple issues, including neck pain and headaches.

Mr. Dowdy began treating with Dr. Milan Mody, an orthopedic surgeon, on January 26, 2021 for both neck and back pain. After reviewing Mr. Dowdy's test results and imaging studies, Dr. Mody diagnosed Mr. Dowdy with cervical stenosis, cervical radiculopathy, cervical spondylosis, cervicalgia, lumbar radiculopathy, lumbago, and lumbar spondylosis with radiculopathy. He recommended a cervical decompression and fusion due to Mr. Dowdy's severe spinal stenosis if conservative measures did not improve his pain. Mr. Dowdy saw Dr. Mody (or a physician's assistant) in January, March, April, and June 2021, and again on January 25, 2022, at which time Dr. Mody recommended that Mr. Dowdy proceed with the cervical surgery.

Mr. Dowdy also began seeing Dr. Jeffrey Adair in August 2021 for neck pain, and his records reflect Mr. Dowdy underwent medial branch blocks in November and December 2021 and radiofrequency ablation in December 2021 and January 2022. While Mr. Dowdy reported that these procedures helped, at his February 15, 2022 appointment, he filled out a form reporting that he had only 40% relief from for two weeks.

Dr. Mody's deposition was introduced at trial. Dr. Mody reviewed Mr. Dowdy's December 2018 MRI and testified that it showed moderate to severe stenosis at multiple levels, mainly at the C4-C5 and C5-C6 levels. At the time, Dr. Mody opined that Mr. Dowdy was a candidate for neck surgery, an anterior cervical decompression and fusion. Mr. Dowdy wanted instead to try injections but because they did not help, Dr. Mody again recommended cervical surgery.

In Dr. Mody's opinion, based on a reasonable degree of medical certainty, it is more probable than not that Mr. Dowdy will ultimately require surgery. He also testified that, based on a reasonable degree of medical certainty, the incident at

34

Enable caused or exacerbated Mr. Dowdy's cervical condition necessitating the need for surgery. Dr. Mody believed Mr. Dowdy to be honest and testified that the studies and his physical examination supported Mr. Dowdy's complaints.

Dr. Mody agreed that Mr. Dowdy had pre-existing degenerative conditions that would have worsened with time but opined that the incident exacerbated those conditions. Although Dr. Mody agreed that Mr. Dowdy had been treating for neck issues for quite some time before the June 2018 incident, Dr. Dowdy's view of the prior records showed that Mr. Dowdy's chief complaints were with his lumbar spine. As to the changes reflected in Mr. Dowdy's post-incident studies compared to his prior studies, Dr. Mody explained:

> . . . clearly his stenosis is more significant on his post-blast MRI in 2020, as well as 2021, with moderate to severe stenosis at C4-5, 5-6, 6-7 and 7-1, whereas previously it was only 6-7, per Dr. Gordon's report. So clearly that's, you know, a matter of a few years.
>
> So when these changes happen -- degenerative changes happen -- they happen slowly over decades rather than quickly, so his 6-7 was already present, but now he's got 4-5, 5-6 and 7-1.

While Dr. Gordon's records following the 2104 accident showed that he had issues at the C4-5 and C5-6 levels, according to Dr. Mody, these "were degenerative disc changes . . ., but no stenosis."

General damages are reviewed for an abuse of discretion because the trial court "is in the best position to evaluate witness credibility and see the evidence firsthand." *Bouquet v. Wal-Mart Stores, Inc.*, 08-309, p. 4 (La. 4/4/08), 979 So. 2d 456, 459. "The role of an appellate court in reviewing a general damages award is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact." *Id.*, 08-309, p. 5, 979 So. 2d at 459. The discretion accorded to the trier of fact in fixing general damages is vast, "such that

35

an appellate court should rarely disturb an award of general damages." *Howard v. Union Carbide Corp.*, 09-2750, p. 5 (La. 10/19/10), 50 So. 3d 1251, 1255-56

As this Court recently reiterated in *Pete v. Boland Marine & Mfg. Co., LLC*, 23-00170, p. 9 (La. 10/20/23), 379 So. 3d 636, 643 (quoting *Youn v. Mar. Overseas Corp.*, 623 So. 2d 1257, 1261 (La.1993)):

> . . . [r]easonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.

We have considered the record under the foregoing principles and we cannot say that the trial judge abused his discretion in fixing the award of general damages for Mr. Dowdy's cervical spine issues. We find the award to be within that which a reasonable trier of fact could assess for Mr. Dowdy's injuries and we therefore affirm that award.

## DECREE

For the foregoing reasons, the trial court's judgment is amended to reallocate fault as follows: 70 percent to Enable Midstream Partners, LP and 30 percent to White Oak Radiator Service, Inc. As amended, the trial court judgment is affirmed.

**AMENDED IN PART; AFFIRMED AS AMENDED.**

MARILYN H. MCBRIDE, DAVY A. DOWDY, AND JOEY E. MILLER

VS.

OLD REPUBLIC INSURANCE COMPANY, JOHN K. WOODARD, DAVID G. BROOKS, SR., AND ENABLE MIDSTREAM PARTNERS, LP

On Writ of Certiorari to the Court of Appeal, Second Circuit, Parish of Red River

**CRAIN, J.**, dissenting in part.

I agree with the majority opinion except for the fault reallocation and affirming the damages awarded to Dowdy for permanent loss of hearing. Louisiana Civil Code article 2323 requires the fault of all persons causing or contributing to the injury be determined, regardless of whether the person is a party to the suit. Given the evidence of multiple contributors to the subject accident, the trial court abused its discretion in assessing 90% fault to Enable. The highest percentage of fault for Enable within the trial court's discretion is 60%. *See Malta v. Herbert S. Hiller Corp.*, 21-00209 (La. 10/10/21), 333 So. 3d 384, 407.

I would also reverse the damages awarded to Dowdy for his alleged *permanent* hearing loss, because the evidence does not establish causation. The *Housley* presumption is inapplicable due to the absence of any medical evidence establishing a reasonable possibility of a causal connection between the accident and the hearing loss. *See Housley v. Cerise*, 579 So. 2d 973, 980 (La. 1991). The causal connection between the accident and the injury is not so obvious that expert testimony is not necessary to prove it, particularly given the trial court awarded general damages for the hearing loss of $100,000. *See Pfiffner v. Correa*, 94-0924 (La. 10/17/94), 643 So. 2d 1228, 1234. For these reasons, I dissent in part.

# SUPREME COURT OF LOUISIANA

## No. 2024-C-01519

## MARILYN H. MCBRIDE, DAVY A. DOWDY, AND JOEY E. MILLER

## VS.

## OLD REPUBLIC INSURANCE COMPANY, JOHN K. WOODARD, DAVID G. BROOKS, SR., AND ENABLE MIDSTREAM PARTNERS, LP

*On Writ of Certiorari to the Court of Appeal, Second Circuit, Parish of Red River*

**GRIFFIN, J., dissents in part and assigns reasons.**

I respectfully dissent in part and would not disturb the allocation of fault assigned by the trial court.